The relief described hereinbelow is SO ORDERED.

Signed January 30, 2011.

ROBERT D. BERGER
United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS
KANSAS CITY DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 11-20140-11-rdb |
| ICOP DIGITAL, INC. | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

**INTERIM ORDER AUTHORIZING**
**(I) DEBTOR TO OBTAIN POST PETITION FINANCING PURSUANT TO 11 U.S.C §§ 105, 363, 364(c)(1), 364(c)(2), 364(d)(1), AND 503(b)(1); (II) DEBTOR TO ENTER INTO A LETTER OF INTENT FOR THE SALE OF ASSETS AND APPROVING PURCHASE PROTECTION PROVISIONS; AND (III) SCHEDULING A FINAL HEARING PURSUANT TO FED. R. BANKR. P. 2002, 4001 AND 9014**
**(Related Docket No. 2)**

This matter came before the Court for hearing on the 28th day of January, 2011, upon the motion ("**the Financing Motion**") of ICOP Digital, Inc. ("**Debtor**"), Debtor-in-Possession, for entry of an interim order pursuant to sections 364(c) and (d) of the Bankruptcy Code, granting the Debtor authority to obtain a post-petition, secured financing facility ("**the Credit Facility**") from Safety Vision LLC (**SV**) on the terms and conditions set forth in that certain Debtor-In-Possession Credit Agreement by and between the Debtor and SV, a copy of which is attached to

this Order as Exhibit A, ("**the DIP Credit Agreement**").[1] The following appearances were noted on the record: Joanne B. Stutz, Thomas M. Mullinix and John E. Larson of Evans & Mullinix, P.A. as counsel for the Debtor; Scott A. Wissel of Lewis, Rice & Fingersh, L.C. and Trent L. Rosenthal of Beirne Maynard & Parsons, LLP as counsel for Safety Vision, LLC; and George D. Halper of McAnany, Van Cleave & Phillips, P.A. as counsel for Bank of Blue Valley. There were no other parties in attendance

Notice of the Financing Motion having been given to the Office of the United States Trustee, counsel for SV, FFC, LLC ("**First Growth**") and all parties on the Debtor's Initial Master Service List; and the Court having conducted a preliminary hearing to consider the relief requested in the Financing Motion ("**the Preliminary Hearing**"); and upon the entire record of the Preliminary Hearing, including any evidence presented or statements of counsel at the Preliminary Hearing, and after due deliberation thereon, and good and sufficient cause appearing therefore, it is hereby

**ORDERED, ADJUDGED AND DECREED** that:

1. This Court has jurisdiction over these proceedings and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (D), and (O).

2. Venue is proper before this Court pursuant to 28 U.S.C. § 1408 and 1409.

[1] All initially capitalized terms used herein shall have the same meaning assigned in the DIP Credit Agreement,

3. The Motion is **GRANTED** on an interim basis to the extent set forth herein.

4. The terms and conditions articulated in the DIP Credit Agreement are hereby approved on an interim basis.

5. The Court further approves the terms and conditions of the letter dated January 18, 2011, a copy of which is attached hereto as Exhibit B, pursuant to which SV advanced the Debtor $15,000.00, which sum shall constitute, at the option of SV, an advance against either the DIP Credit Agreement or the Purchase Price received from the sale of the Debtor's assets.

6. The Debtor is authorized, on an interim basis prior to final hearing hereof, to obtain credit and borrow up to $500,000 from SV, in accordance with the terms of this Order and the DIP Credit Agreement.

7. The Debtor is authorized to perform and do all acts that are required or contemplated by or in connection with this Order and the DIP Credit Agreement, including executing and delivering any and all documents contemplated under the DIP Credit Agreement and/or necessary to effectuate the terms of the Financing Facility ("**the Financing Documents**") and the Debtor is authorized to execute and deliver the DIP Credit Agreement and the Financing Documents. The Debtor is further authorized to comply with and perform all of the terms and conditions of the DIP Credit Agreement and any other Financing Documents and the Debtor is authorized to repay to SV amounts borrowed with interest, plus all other costs, fees, expenses,

---

unless otherwise defined..

charges, and claims, in accordance with and subject to the terms and conditions set forth in the DIP Credit Agreement, any other Financing Documents and this Order.

8. All obligations under this Order and the DIP Credit Agreement that the Debtor owes to SV (collectively, "**the Credit Facility Obligations**") shall constitute obligations that are valid, binding, and enforceable against the Debtor and its estate in accordance with their terms.

9. Other than the claim of SV no other claim or lien having a priority superior to or *pari passu* with any of the Credit Facility Obligations shall be granted while any of the Credit Facility Obligations remain outstanding.

10. As security for the Credit Facility Obligations, SV shall have and hereby is granted pursuant to sections 364 (c)(1), 364(c)(2), and (c)(3) and (d)(1) of the Bankruptcy Code (effective upon the Closing Date and without the necessity of the execution by the Debtor of mortgages, security agreements, pledge agreements, financing statements, or otherwise) valid, enforceable, and perfected security interests in and liens of the highest available priority on all assets (tangible, intangible, real, personal and mixed, including, without limitation, the Collateral described in Section 6.1 of the DIP Credit Agreement) of the Debtor, whether now owned or hereafter acquired ("**the Liens**"). Additionally, the obligations owing under the DIP Credit Agreement and Credit Facility shall constitute a super-priority administrative claim pursuant to Section 364 (c)(1) of the Bankruptcy Code and Section 503 (b)(1) of the Bankruptcy Code, and shall have priority over all other administrative expenses under Section 503(b)(1) and 507(b) of

the Bankruptcy Code. However, notwithstanding anything contained herein to the contrary, the liens of SV securing the Credit Facility on the Debtor's real estate, consisting of approximately 11.64 acres at the Northwest corner of College & Renner, Olathe, Kansas, the legal description for which is attached hereto as Exhibit C, and in the deposit accounts shall be junior to and inferior to the liens held by Bank of Blue Valley in the real property and in the deposit account maintained at Bank of Blue Valley.

11. The Liens shall constitute valid and duly perfected security interests and liens, and SV shall not be required to file or serve financing statements, notices of lien, or similar instruments that otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and Ls; and the failure by the Debtor to execute any documentation relating to the Liens shall in no way affect the validity, perfection, or priority of such Liens. If, however, SV, in its sole discretion, shall decide to file any such financing statements, notices of lien, or similar instruments, or to otherwise confirm perfection of such Liens, the Debtor shall reasonably cooperate with and assist in such process, and the stay imposed by section 362(a) of the Bankruptcy Code is hereby lifted to the limited extent necessary to allow the filing and recording of a certified copy of this Order or any such financing statements, mortgages, notices of lien, or similar instruments, and all such documents shall be deemed to have been filed or recorded at the time of and on the date of this Order.

11. All credit extended and loans made to the Debtor by SV in connection with the Credit Facility shall be and hereby are deemed to have been extended in good faith, as that term is used in section 364(e) of the Bankruptcy Code.

12. Notwithstanding anything to the contrary contained in the Financing Motion or this Order, the lien granted to SV shall remain in first priority as to the Collateral, excepting the real property and the deposit account at Bank of Blue Valley, in which case the lien granted to SV shall be subject to the senior and prior lien of Bank of Blue Valley, with no prior carve-out liens for professional fees and expenses and/or U.S. Trustee Fees; provided, however, subject to and conditioned on the terms of the DIP Credit Agreement, SV shall advance loans to the Debtor to fund professional fees of the Debtor's professionals and the U.S. Trustee Fees in the amounts not to exceed the budgeted amount, or such amounts as may be later agreed to, set forth on the Budget attached to the DIP Credit Agreement during the Commitment Period, but in no event shall any such advance increase the total Commitment set forth in the DIP Credit Agreement or in any modification of the DIP Credit Agreement or require any advance in excess of such Commitment.

13. The provisions of this Order and the DIP Credit Agreement shall be binding upon the Debtor, its successors and assigns (including any Chapter 7 trustee hereinafter appointed for the Debtor's estate to the extent allowed under applicable law), and all creditors, shareholders, and parties in interest to this bankruptcy case and shall inure to the benefit of the Debtor, the

Debtor's estate and SV. The provisions of this Order and the DIP Credit Agreement shall survive entry of any order that may be entered converting or dismissing the case, and the claims and liens granted herein shall maintain their priority and validity against the Debtor and its estate, as provided herein.

14. Upon the occurrence and during the continuance of an Event of Default, SV may take all or any of the following actions without further modification of the automatic stay pursuant to section 362 of the Bankruptcy Code (which is hereby deemed modified, and vacated to the limited extent necessary to permit such exercise of rights and remedies and the taking of such actions) or further order of or application to this Court: (a) terminate the credit commitments or obligation to make Post-Petition Loans to the Debtor under the Credit Facility; and (b) declare the principal and accrued interest, fees, and other liabilities constituting the Credit Facility Obligations to be due and payable.

15. In the event of any inconsistency between the provisions of this Order and the provisions of the DIP Credit Agreement and any documents and instruments executed in connection therewith, the provisions of this Order shall govern. The Debtor and SV hereby are authorized to make any nonmaterial amendments, modifications or waivers to the DIP Credit Agreement and the other Financing Documents without notice or further order of the Court and are authorized to execute any additional agreements necessary to document such amendments, modifications or waivers.

16. The DIP Credit Agreement provides for a loan for the satisfaction of the debt owed to FCC, LLC, dba First Growth Capital ("**First Growth**"), which debt is secured by the Debtor's accounts receivable. SV has agreed to promptly loan funds under the DIP Credit Agreement to pay the sums owed First Growth. Therefore, upon entry of this Order SV shall be authorized to immediately contact First Growth to determine, with the Debtor, the amount required to satisfy the debt owed First Growth and, if there is no objection by the Debtor to the amount alleged to be due by First Growth, SV shall promptly advance funds under the DIP Credit Facility to pay said amount without further Court Order. The Debtor is authorized to pay-off First Growth. In the event the Debtor disputes the amount First Growth alleges is due, the Court shall, at the final hearing on the Financing Motion (i) determine the amount owed First Growth, (ii) require First Growth to accept that amount in full satisfaction of the debt owed and (ii) order First Growth to release any and all liens and/or assign its liens and lockbox to SV, and re-convey any factored accounts receivable to the Debtor (subject to the lien of SV).

15. This Order shall be effective immediately upon entry by the Court.

16. The Court will conduct a final hearing to consider the relief requested in the Financing Motion on the **16th day of February, 2011, at 1:30 p.m**. The Debtor shall give immediate notice of the final hearing to all creditors and parties in interest and file a certificate of service.

IT IS SO ORDERED.

# # #

Submitted by:

Evans & Mullinix, P.A.

*/s/ Joanne B. Stutz*

Joanne B. Stutz, Ks #12365; Mo #30820
7225 Renner Road, Suite 200
Shawnee, KS 66217
(913) 962-8700; (913) 962-8701 (Fax)
jbs@evans-mullinix.com
*Attorneys For The Debtor*

Approved by:

Beirne Maynard & Parsons, LLP

*/s/ Trent L. Rosenthal*

Trent L. Rosenthal
Texas State Bar No. 17282300
1300 Post Oak Blvd., Suite 2500
Houston, TX 77056
(713) 623-0887; (713) 960-1527 (Fax)
trosenthal@pmpllp.com

and

Lewis, Rice & Fingersh, L.C.

*/s/ Scott A. Wissel*

Scott A. Wissel, KS #18589
1010 Walnut Street, Suite 500
Kansas City, MO 64106
(816) 421-2500; (816) 472-2500 (Fax)
sawissel@lrf-kc.com
*Attorneys for Safety Vision, LLC*

McAnany, Van Cleave & Phillips, P.A.

*/s/ George D. Halper*

George D. Halper, KS #14736
10 East Cambridge Circle Drive, Suite 300
P.P. Box 171300
Kansas City, SK 66117
(913) 371-3838; (913) 371-4722 (Fax)
ghalper@mvplaw.com
*Attorneys for Bank of Blue Valley*

## TABLE OF CONTENTS


ARTICLE 1
FACILITY

Section 1.1 Post-Petition Loans ........ 1

ARTICLE 2
INTEREST, FEES AND CHARGES

Section 2.1 Interest, Fees and Charges ........ 2

ARTICLE 3
LOAN ADMINISTRATION

Section 3.1 Manner of Borrowing and Funding Post-Petition Loans ........ 3

ARTICLE 4
PAYMENTS

Section 4.1 General Payment Provisions ........ 3
Section 4.2 Repayment of Post-Petition Loans ........ 3
Section 4.3 Payment of Other Obligations ........ 4
Section 4.4 Receipt of Payments and Collections ........ 4
Section 4.5 Prepayments ........ 4

ARTICLE 5
TERM AND TERMINATION OF COMMITMENT

Section 5.1 Term of Commitment ........ 4
Section 5.2 Termination ........ 4

ARTICLE 6
COLLATERAL SECURITY

Section 6.1 Grant of Security Interest in Collateral ........ 5
Section 6.2 Other Collateral ........ 6
Section 6.3 Lien Perfection; Further Assurances ........ 6
Section 6.4 Lien Priority; Application of Collateral ........ 6

ARTICLE 7
COVENANTS

Section 7.1 Covenants ........ 7

ARTICLE 8
CONDITIONS PRECEDENT

Section 8.1 Conditions Precedent to Effectiveness ........ 8
Section 8.2 Additional Conditions Precedent To Each Post-Petition Loan ........ 8
Section 8.3 Limited Waiver of Conditions Precedent ........ 9

**TABLE OF CONTENTS**
**(continued)**

ARTICLE 9
EVENTS OF DEFAULT; RIGHTS AND REMEDIES ON DEFAULT

Section 9.1 Events of Default .......... 9
Section 9.2 Acceleration of the Obligations .......... 10
Section 9.3 Remedies .......... 10
Section 9.4 Setoff Remedy .......... 11
Section 9.5 Remedies Cumulative; No Waiver .......... 11

ARTICLE 10
MISCELLANEOUS

Section 10.1 Governmental Regulation .......... 12
Section 10.2 Performance of Obligations .......... 12
Section 10.3 Headings .......... 13
Section 10.4 Amendments .......... 13
Section 10.5 Benefits of this Agreement .......... 13
Section 10.6 Severability of Provisions .......... 13
Section 10.7 Governing Law .......... 13
Section 10.8 No Strict Construction .......... 13
Section 10.9 Business Loans .......... 13
Section 10.10 No Responsibility for Loans, Creditworthiness, Collateral, Recitals, Etc. .......... 13
Section 10.11 Reliance on Documents; Counsel .......... 14
Section 10.12 Notices .......... 14
Section 10.13 Counterparts .......... 15
Section 10.14 Successor and Assigns .......... 15
Section 10.15 ENTIRE AGREEMENT .......... 15

**APPENDICES**

Appendix A – General Definitions, Matters of Construction ..........

**SCHEDULES AND EXHIBITS**

Exhibit A – Form of Note
Exhibit B – Form of Notice of Borrowing
Exhibit C – Form of Consent and Estoppel
Exhibit D – Form of Lockbox Agreement

Schedule 6.1(m) - Commercial Tort Claims
Schedule A - Existing Loans

Attachment 1 – Budget

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

**THIS DEBTOR-IN-POSSESSION CREDIT AGREEMENT** dated as of January__ 2011 (this "**Agreement**"), by and between ICOP Digital, Inc., Debtor and Debtor in Possession, a Colorado corporation (hereinafter referred to as "**Debtor**" or "**Borrower**") and Safety Vision, LLC, a Texas limited liability company ("**Lender**"). Capitalized terms used in this Agreement and not otherwise defined herein have the meanings assigned to them in Appendix A, General Definitions.

## RECITALS:

A. On January 21, 2011, the Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Kansas (the "**Court**"), commencing the case (the "**Chapter 11 Case**"). Debtor has remained a debtor and debtor-in-possession.

B. Borrower has requested that Lender extend a secured multi-draw term facility in an aggregate amount up to $500,000 to fund certain post-petition expenses, including monthly rent and insurance, and to pay off the pre-petition factoring arrangement with First Growth, (i.e. existing loans described on Schedule A) as set forth on and consistent with the Budget attached hereto as **Attachment 1 (the "Budget")**.

C. Borrower and Lender have entered into a Letter of Intent for the sale of Debtor's assets to a subsidiary of Lender or its assigns (the "**LOI**").

D. Lender is willing to make such term loans to Borrower upon the terms and subject to the conditions set forth herein. These term loans are to be used so that the Debtor may maintain its Chapter 11 Case to facilitate the agreements contemplated in the LOI.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the parties hereto hereby agree as follows:

## ARTICLE 1
## FACILITY

Subject to the terms and conditions of this Agreement and the other Financing Documents, Lender agrees to make the Facility available to Borrower, in an aggregate amount up to the Commitment, as follows:

Section 1.1 Post-Petition Loans.

(a) General. Subject to the terms and conditions of this Agreement, Lender agrees to make Post-Petition Loans to Borrower, on any Business Day during the period from and including the Closing Date to, but not including, the Commitment Termination Date (such period, the "**Commitment Period**"), in an aggregate principal amount which does not exceed the Commitment. The Post-Petition Loans shall bear interest as set forth in Section 2.1, be secured by the Collateral and be evidenced by the Note.

(b) Use of Proceeds. (i) The proceeds of the Post-Petition Loans shall be used by Borrower during the pendency of the Chapter 11 Case exclusively for one or more of the following purposes: (A) to pay post-petition expenses, including monthly payroll and taxes, and professional fees and expenses incurred in connection with the administration and preservation of the bankruptcy estate of the Debtor, (B) to pay amounts detailed on the Budget, including payoff of the Existing Pre-Petition Loans as listed in Schedule A. However, (i) any line item appearing in said Budget may be exceeded during any one calendar month by not more than ten percent (10%) and (ii) the aggregate total of all line items appearing in the entire Budget during any calendar month may be exceeded by not more than ten percent (10%). Notwithstanding the foregoing, if Lender consents in writing Debtor may incur any obligation not included in the Budget or may exceed a line item appearing therein by more than the above stated limitations.

(ii) Notwithstanding anything to the contrary, in no event shall the proceeds of the Post-Petition Loans be used (A) for any purpose that is not permitted under the Bankruptcy Orders, (B) to initiate or prosecute any Claims, causes of action, adversary proceedings or other litigation against Lender or any of its respective present and future subsidiaries, officers, directors, employees, agents, attorneys, other representatives or Affiliates, or (C) to object, contest or raise in any proceeding any defense to the validity, perfection, priority, extent or enforceability of the Facility (including the Liens granted in connection therewith), or the claims of Lender or any of its respective present and future subsidiaries, officers, directors, employees, agents, attorneys, other representatives or Affiliates.

(c) Note. The Post-Petition Loans made by Lender and interest accruing thereon shall be evidenced by the records of Lender and by the Note payable to Lender, which shall be executed by Borrower, completed in conformity with this Agreement and delivered to Lender on the Closing Date. All outstanding principal amounts and accrued interest under the Note shall be due and payable as set forth in Section 4.2.

## ARTICLE 2
## INTEREST, FEES AND CHARGES

Section 2.1 Interest, Fees and Charges.

(a) Rates of Interest and Fees. Borrower agrees to pay interest on all unpaid principal amounts of the Post-Petition Loans from the respective dates such principal amounts are advanced until indefeasibly paid in full (whether at stated maturity, on acceleration or otherwise) at the Base Rate. Borrower also agrees to pay $10,000 to Lender as a one time-fee for attorneys' fees, costs and expenses for establishing this Facility, and such money may be advanced hereunder and paid directly to Lender.

(b) Computation of Interest. Interest shall be calculated on a daily basis, commencing on the date of funding of the Post-Petition Loan. Interest on the Post-Petition Loans and fees payable pursuant hereto will be computed for the actual number of days elapsed on the basis of a 360-day year. Interest shall be payable from the day an Obligation is incurred through, but excluding, the date such Obligation is paid, so long as such payment is received prior to 5:00 p.m. at the place of payment.

## ARTICLE 3
## LOAN ADMINISTRATION

Section 3.1 Manner of Borrowing and Funding Post-Petition Loans. Borrowings under the Commitment established pursuant to Article 1 shall be made and funded as follows:

(a) Notice of Borrowing. Whenever Borrower desires to make a Borrowing under this Agreement, Borrower shall give Lender prior written notice of such Borrowing by delivery of a notice of borrowing (a "**Notice of Borrowing**"), which shall be in the form of Exhibit B annexed hereto and signed by Borrower. Each Notice of Borrowing shall be given by Borrower no later than 12:00 noon, at the office of Lender, as designated by Lender from time to time, one (1) Business Day before the requested funding date of such Borrowing. Notices received after 12:00 noon shall be deemed received on the next Business Day. Each Post-Petition Loan shall be in the minimum amount of $10,000.00 (unless otherwise agreed by Lender). Each Notice of Borrowing shall be irrevocable and shall specify (A) the principal amount of the proposed Borrowing, (B) the date of the proposed Borrowing (which shall be a Business Day), and (C) the proposed use of the proceeds thereof.

(b) Fundings by Lender. Subject to its receipt of a timely Notice of Borrowing as provided in Section 3.1(a), and if Lender is otherwise obligated under the Financing Documents to honor such funding request hereunder, Lender shall initiate the Borrowing so requested and otherwise in accordance with Borrower's disbursement instructions set forth in the applicable Notice of Borrowing.

## ARTICLE 4
## PAYMENTS

Section 4.1 General Payment Provisions. All payments (including all prepayments) of principal of and interest on the Post-Petition Loans and other Obligations that are payable to Lender shall be made to Lender in Dollars, without any offset or counterclaim and free and clear of (and without deduction for) any present or future Taxes, by wire transfer of immediately available funds not later than 5:00 p.m. on the due date (whether at stated maturity, on acceleration or otherwise).

Section 4.2 Repayment of Post-Petition Loans.

(a) Payment of Principal. The outstanding principal amounts with respect to the Post-Petition Loans shall be due and payable on the Commitment Termination Date.

(b) Payment of Interest. Interest accrued on each Post-Petition Loan shall be due and payable in arrears on (i) the date any prepayment of such Post-Petition Loan is made to the extent accrued on the amount being prepaid and (ii) on the Commitment Termination Date.

(c) Payment Not Due on Business Day. If any payment of principal of or interest on a Post-Petition Loan or any payment of any other Obligations shall become due on a day which is not a Business Day, such payment shall be made on the next succeeding Business

Day and, in the case of a principal payment, interest shall continue to accrue during such extension of time.

(d) The proceeds from the sale of the Assets to the Lender or another party shall be used to first repay the principal, interest and all other amounts due hereunder.

Section 4.3 Payment of Other Obligations. (a) The balance of the Obligations requiring the payment of money shall be repaid by Borrower to Lender as and when provided in the Financing Documents, or (b) if no date of payment is otherwise specified in the Financing Documents, such Obligations shall be paid on demand, which demand shall be deemed to have been made upon the Commitment Termination Date.

Section 4.4 Receipt of Payments and Collections. All payments received by Lender by 5:00 p.m. on any Business Day shall be deemed received on that Business Day. All payments received by Lender after 5:00 p.m. on any Business Day shall be deemed received on the next Business Day. Except to the extent that the manner of application to the Obligations of payments or proceeds of Collateral are expressly governed by other provisions of this Agreement, Borrower irrevocably waives the right to direct the application of any and all payments and Collateral proceeds at any time or times received by Lender from or on behalf of Borrower, and Borrower irrevocably agrees that Lender shall have the continuing exclusive right to apply and reapply any and all such payments and Collateral proceeds received at any time or times hereafter by Lender or its agent against the Obligations, in such manner as Lender may deem advisable, notwithstanding any entry by Lender upon any of its books and records.

Section 4.5 Prepayments. Borrower may, at any time and from time to time, prepay the Post-Petition Loans, in whole or in part, without premium or penalty, upon irrevocable written notice delivered to Lender at least three (3) Business Days prior thereto, which notice shall specify the date and amount of prepayment. Any partial payment pursuant to this Section 4.5 shall be in an amount equal to $10,000.00 or a whole multiple thereof. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with accrued interest to the date of such prepayment on the amount being prepaid.

## ARTICLE 5
## TERM AND TERMINATION OF COMMITMENT

Section 5.1 Term of Commitment. Subject to Lender's right to cease making Post-Petition Loans to Borrower when any Default or Event of Default exists and is continuing, the Commitment shall be in effect during the Commitment Period.

Section 5.2 Termination.

(a) Termination by Lender. Upon prior written notice to the Borrower and subject to compliance with the terms and conditions of Section 9.2, Lender may terminate the Facility (and any Commitment thereunder) at any time.

(b) Termination by Borrower. Borrower may terminate the Facility (in its entirety only) at any time upon ten (10) Business Days prior written notice to Lender; *provided,*

*however,* no such termination by Borrower shall be effective until Full Payment of the Obligations.

(c) Effect of Termination. On the Commitment Termination Date, all of the Obligations shall be immediately due and payable, and Lender shall have no further obligation to make any Post-Petition Loans. All undertakings, agreements, covenants, warranties and representations of Borrower contained in the Financing Documents shall survive any such termination, and Lender shall retain its Liens in the Collateral and all of its rights and remedies under the Financing Documents notwithstanding such termination until Full Payment of the Obligations. The provisions of this Section 5.2(c) shall in all events survive Full Payment of the Obligations and any termination of the Commitment.

## ARTICLE 6
## COLLATERAL SECURITY

Section 6.1 Grant of Security Interest in Collateral. In accordance with sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, to secure the prompt and Full Payment and performance of all of the Obligations, Borrower, on behalf of the Debtor and the Debtor's estate, hereby grants to Lender (i) a first priority administrative claim under Section 503 (b) of the Bankruptcy Code in the amount of the Obligations, and (ii) a continuing security interest in and Lien upon all of the following Property and interests in Property of the Debtor and the Debtor's estate, whether now owned or existing or hereafter created, acquired or arising (irrespective of whether the same existed on or was created or acquired after the Petition Date):

(a) all Accounts;

(b) all Deposit Accounts;

(c) all General Intangibles (including all intellectual property and patents);

(d) all Instruments;

(e) all Investment Property;

(f) all certificated Securities;

(g) all Chattel Paper;

(h) all Contracts;

(i) all Documents;

(j) all Letter-of-Credit Rights;

(k) all Equipment;

(l) all Inventory and all other goods and tangible personal property;

(m) all Commercial Tort Claims, including those described on Schedule 6.1(m);

(n) all real property;

(o) the deposit remitted by the Lender or any other purchaser as earnest money towards the purchase of the Debtor's assets;

(p) all cash and non-cash proceeds of (a) through (o) above, including proceeds of and unearned premiums with respect to insurance policies insuring any of the Collateral; and

(q) all books and records (including customer lists, files, correspondence, tapes, computer programs, print-outs, and other computer materials, records, legal files and evidence subject to the preservation of any privileged materials contained therein) pertaining to any of (a) through (o) above.

Section 6.2 Other Collateral. In addition to the items of Property referred to in Section 6.1 above, the Obligations shall also be secured by all of the other items of Property from time to time described in the Bankruptcy Orders as security for all of the Obligations.

Section 6.3 Lien Perfection; Further Assurances. Promptly after Lender's request therefore, Borrower shall execute or cause to be executed and deliver to Lender such instruments, assignments, title certificates or other documents as are necessary under the UCC or other Applicable Law (including any motor vehicle certificates of title act) to perfect (or continue the perfection of) Lender's Lien upon the Collateral, and shall take such other action as may be reasonably requested by Lender to give effect to or carry out the intent and purposes of this Agreement. Borrower hereby authorizes Lender to file any financing statements or amendments thereto (including continuation statements) which may be necessary under the UCC to effectuate the intent of the Financing Documents. Borrower agrees that such financing statements may describe the collateral in the same manner as described in the Financing Documents or as "all assets" or "all personal property" of the Debtor, or contain such other description as the Lender, in its sole judgment, determines is necessary or advisable. The parties agree that a carbon, photographic or other reproduction of this Agreement shall be sufficient as a financing statement and may be filed in any appropriate office in lieu thereof.

Section 6.4 Lien Priority; Application of Collateral.

(a) The Liens and security interests granted to Lender pursuant to the provisions of this Article 6 and pursuant to any of the Financing Documents shall be post-petition Liens and security interests in the Collateral.

(b) Any payment or prepayment of the Post-Petition Loans, and any application of proceeds of the Collateral granted to Lender pursuant to the provisions of this Article 6 and pursuant to any of the other Financing Documents, shall be applied in satisfaction of the Obligations.

## ARTICLE 7
## COVENANTS

Section 7.1 Covenants. From and after the Closing Date until Full Payment of the Obligations, Borrower, on behalf of itself, the Debtor and the Debtor's estate, covenants that it shall comply with the following covenants:

(a) Maintenance of Property; Insurance. Borrower will keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted. Borrower shall maintain for itself and the Debtor's estate, or shall cause the Debtor's estate to maintain, in full force and effect insurance policies and programs reflecting coverage that is reasonably consistent with prudent industry practice and Lender shall be named a loss payee on such insurance.

(b) Indebtedness. Borrower shall not create, issue, incur, assume, become liable in respect of or suffer to exist any indebtedness, except (i) indebtedness incurred pursuant to this Agreement, (ii) indebtedness incurred prior to the Petition Date, and (iii) trade accounts payable incurred in the ordinary course of business that are not more than 90 days past due or that are being contested in good faith by appropriate proceedings conducted diligently and for which adequate reserves are maintained in accordance with GAAP.

(c) Liens. Borrower shall not, directly or indirectly, create, incur or assume after the Closing Date any Lien on or with respect to any of the Collateral except (a) statutory Liens of landlords, carriers, warehousemen, mechanics and materialmen arising in the ordinary course of business and seeking amounts not yet due, (b) deposits to secure the performance of bids, trade and utility contracts (other than for borrowed money), leases, statutory obligations and other obligations of a like nature incurred in the ordinary course of business, and (c) Liens for postpetition Taxes not yet due and payable or that are being contested in good faith by appropriate proceedings conducted diligently and for which adequate reserves are maintained in accordance with GAAP. In addition, after the Closing Date, neither Borrower nor the Debtor's estate shall become a party to any agreement, note, indenture or other instrument, or take any other action, which would prohibit the creation of a Lien on any of its properties or other assets in favor of Lender or other holders of the Obligations, as collateral for the Obligations.

(d) Dispositions of Property. Except to the extent authorized by order of the Court or pursuant to the terms of the LOI, neither Borrower nor the Debtor's estate shall dispose of, or enter into any contract to dispose of, any of its Property (including any equity interests in any Person), whether now owned or hereafter acquired, except the sale of inventory in the ordinary course of business.

(e) Affiliates.

(f) Other Information. Promptly upon receiving a written request therefore from Lender, Borrower shall use reasonable efforts to promptly prepare and deliver to Lender such other information with respect to the Debtor or the Collateral as from time to time may be reasonably requested by Lender.

(g) Further Assurances. From time to time, Borrower, upon request by Lender, shall take such additional actions and execute such additional documents as Lender may deem necessary or appropriate to more adequately effectuate the provisions of this Agreement and the other Financing Documents.

## ARTICLE 8
## CONDITIONS PRECEDENT

Section 8.1 Conditions Precedent to Effectiveness. Notwithstanding any other provision of this Agreement or any of the other Financing Documents, and without affecting in any manner the rights of Lender under other Sections of this Agreement, this Agreement shall not become effective, and Lender shall have no obligation to fund any Post-Petition Loan requested by Borrower, unless and until each of the following conditions has been satisfied or specifically waived in writing by Lender:

(a) All of the Financing Documents shall be in form and substance satisfactory to Lender and its counsel and shall have been executed by each of the signatories thereto and accepted by Lender, and Borrower shall be in compliance with all of the terms thereof.

(b) No Default or Event of Default shall exist at the time of, and would not directly result from the funding of, any requested Post-Petition Loan.

(c) The Interim Order approving the Facility shall have been entered by the Court, shall be in full force and effect and shall not have been vacated, reversed, amended, modified or stayed in any respect (and, if such order is the subject of a pending appeal, no performance of any obligation of any party shall have been stayed pending such appeal).

(d) Lender shall have received such other documents, agreements, certificates and instruments as Lender may reasonably request.

(e) With respect to the period not covered by the Interim Order, the Final Order shall have been entered approving the Facility which shall be in full force and effect and shall not have been vacated, reversed, amended, modified or stayed in any respect (and, if such order is the subject of a pending appeal, no performance of any obligation of any party shall have been stayed pending such appeal.

Section 8.2 Additional Conditions Precedent To Each Post-Petition Loan. Lender shall not have an obligation to make any Post-Petition Loan, unless on each Borrowing Date (including the date of the initial Borrowing), the following conditions have been satisfied or specifically waived in writing by Lender:

(a) The Commitment Termination Date shall not have occurred.

(b) The proceeds of the Post-Petition Loan shall be used only for the purposes set forth in Section 1.1(b).

(c) Lender shall have received a Borrowing Notice with respect to the requested Post-Petition Loan in accordance with Section 3.1.

(d) The amount of the requested Post-Petition Loan, if funded by Lender, would not cause the aggregate amount of all Post-Petition Loans made by Lender to Borrower under this Agreement to exceed the Commitment.

(e) No Default or Event of Default shall have occurred and be continuing on such date or immediately after giving effect to the proposed Post-Petition Loan requested to be made on such date.

Section 8.3 Limited Waiver of Conditions Precedent. If Lender shall make any Post-Petition Loan or otherwise extend any credit to Borrower under this Agreement at a time when any of the foregoing conditions precedent set forth in Sections 8.1 and 8.2 are not satisfied (regardless of whether the failure of satisfaction of any of such conditions precedent is known or unknown to Lender), the funding of such Post-Petition Loan shall not operate as a waiver of the right of Lender to insist upon the satisfaction of all conditions precedent with respect to each subsequent Borrowing requested by Borrower or a waiver of any Default or Event of Default occurring as a result of the failure of any such conditions to be satisfied.

## ARTICLE 9
## EVENTS OF DEFAULT;
## RIGHTS AND REMEDIES ON DEFAULT

Section 9.1 Events of Default. The occurrence of any one or more of the following events shall constitute an "Event of Default":

(a) Failure to Make Payments When Due. Borrower shall fail to pay within three (3) days when due, any of the Obligations consisting of principal or interest with respect to the Post-Petition Loans.

(b) Breach of Covenants Generally. Borrower shall fail or refuse to duly and punctually perform or observe any agreement, covenant or obligation in this Agreement or any other Financing Document (other than as provided in Section 9.1(a)) and such failure or refusal shall continue unremedied for thirty (30) days after notice from Lender to Borrower.

(c) Bankruptcy Orders. (i) From and after the respective date of entry thereof, any Bankruptcy Order shall cease to be in full force and effect, (ii) Borrower shall default in the due performance or observance by it of any term, covenant or agreement contained in any Bankruptcy Order and such default shall continue for a period of five (5) Business Days after the earlier to occur of (A) written notice thereof to the defaulting party by Lender or (B) Borrower's knowledge of such default, or (iii) this Agreement, the other Financing Documents or any Bankruptcy Order shall be amended, supplemented, stayed, reversed, vacated or otherwise modified (or Borrower shall apply for authority to do so), or Borrower or any other Person shall file any pleading requesting any such relief (and, in the case of such other Person, Borrower shall fail to timely object to such pleading) or any motion for such relief shall be granted by the Court, in each case without the prior written consent of Lender.

(d) Chapter 7; Dismissal If prior to the Commitment Termination Date or payment of the Obligations (A) The Chapter 11 Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or Borrower or Debtor shall file a motion or other pleading seeking the dismissal of the Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise; or (B) a trustee under Chapter 11 or chapter 7 of the Bankruptcy Code, or an examiner with enlarged powers related to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code shall be appointed

(e) Motion for Financing. Borrower or Debtor shall file a motion requesting any financing from any Person under section 364(d) of the Bankruptcy Code other than Lender and if such financing shall prime the secured interests of Lender.

(f) Security Documents. Any of the Financing Documents (or any material portion thereof) shall cease, for any reason, to be in full force and effect, or the Borrower or the Debtor shall so assert, or any Lien created by any Financing Document or the Bankruptcy Orders shall cease to be enforceable and of the same effect and priority purported to be created thereby.

Section 9.2 Acceleration of the Obligations. Upon or at any time after the occurrence and during the continuance of any Event of Default, but subject in all respects to the entry of an order by the Court and any limitations contained in the Final Order, Lender may, in its discretion (i) declare the principal of and any accrued and unpaid interest on the Post-Petition Loans and all other Obligations owing under any of the Financing Documents to be, whereupon the same shall become, without further notice or demand (all of which notice and demand Borrower expressly waives), forthwith due and payable and Borrower shall forthwith pay to Lender the entire principal of and accrued and unpaid interest on the Post-Petition Loans and other Obligations plus reasonable attorneys' fees and expenses if such principal and interest are collected by or through an attorney-at-law; and (ii) terminate the Commitment. In the event the entire principal is not paid in full pursuant to the terms of this paragraph, then, and only then, such unpaid principal balance shall accrue interest at the Base Rate plus three percent (3%).

Section 9.3 Remedies. Upon or at any time after the occurrence and during the continuance of an Event of Default, but subject in all respects to the entry of an order by the Court and any limitations contained in the Final Order, Lender may, in its discretion, exercise from time to time the following rights and remedies to enforce collection of the Obligations:

(a) All of the rights and remedies of a secured party under the UCC or under other Applicable Law, and all other legal and equitable rights to which Lender may be entitled under any of the Financing Documents or the Bankruptcy Orders, all of which rights and remedies shall be cumulative and shall be in addition to any other rights and remedies contained in this Agreement or any of the other Financing Documents, and none of which shall be exclusive.

(b) The right to collect Accounts, Chattel Paper, Instruments and General Intangibles and all other rights of the Debtor or the Debtor's estate to the payment of money from any Person obligated therefore; and the right to assume control of and prosecute any cause of action included as part of the Collateral.

(c) The right to take immediate possession of all tangible items of the Collateral and (i) to require Borrower to assemble such Collateral, at Borrower's expense, and make it available to Lender at a place designated by Lender that is reasonably convenient to both parties and (ii) to enter any of the premises of any Debtor or wherever any of the Collateral shall be located, and to keep and store the same on said premises until sold (and if said premises be the Property of any Debtor, Borrower agrees not to charge Lender for storage thereof).

(d) The right to sell or otherwise dispose of all or any Collateral in its then condition, or after any further manufacturing or processing thereof, at public or private sale or sales, with such notice as may be required by Law, in lots or in bulk, for cash or on credit, all as Lender, in its sole discretion, may deem advisable; Borrower agrees that ten (10) days written notice to Borrower of any public or private sale or other disposition of such Collateral shall be reasonable notice thereof, and such sale shall be at such locations as Lender may designate in said notice. Lender shall have the right to conduct such sales on the Debtor's premises, without charge therefore, and such sales may be adjourned from time to time in accordance with Applicable Law; Lender may sell, lease or otherwise dispose of such Collateral, or any part thereof, for cash, credit or any combination thereof, and Lender may purchase all or any part of such Collateral at public or, if permitted by Applicable Law, private sale and, in lieu of actual payment of such purchase price, may set off the amount of such price against the Obligations.

Section 9.4 Setoff Remedy. In addition to any Liens granted under any of the Financing Documents and any rights now or hereafter available under Applicable Law, Lender is hereby authorized at any time that an Event of Default exists, but subject in all respects to the entry of an order by the Court, without notice (except as required by the Final Order) to Borrower or any other Person (any such notice being hereby expressly waived), to set off and to appropriate and to apply any and all deposits (general or special) and any other indebtedness at any time held or owing by Lender to or for the credit or the account of Borrower or the Debtor's estate against and on account of the Obligations, including all Post-Petition Loans and all claims of any nature or description arising out of or in connection with this Agreement, irrespective of whether or not (a) Lender shall have made any demand hereunder, (b) Lender shall have declared the principal of and interest on the Post-Petition Loans and other amounts due hereunder to be due and payable as permitted by this Agreement and even though such Obligations may be contingent or unmatured or (c) the Collateral for the Obligations is adequate.

Section 9.5 Remedies Cumulative; No Waiver.

(a) All covenants, conditions, provisions, warranties, indemnities, and other undertakings of Borrower contained in this Agreement and the other Financing Documents, or in any document referred to herein or contained in any agreement supplementary hereto or in any schedule given to Lender or contained in any other agreement between Lender and Borrower, heretofore, concurrently, or hereafter entered into, shall be deemed cumulative to and not in derogation or substitution of any of the terms, covenants, conditions, or agreements of Borrower herein contained. The rights and remedies of Lender under this Agreement and the other Financing Documents shall be cumulative and not exclusive of any rights or remedies that Lender would otherwise have.

(b) The failure or delay of Lender to require strict performance by Borrower of any provision of any of the Financing Documents or to exercise or enforce any rights, Liens, powers or remedies under any of the Financing Documents or with respect to any Collateral shall not operate as a waiver of such performance, Liens, rights, powers and remedies, but all such requirements, Liens, rights, powers, and remedies shall continue in full force and effect until all Post-Petition Loans, and all other Obligations owing or to become owing from Borrower to Lender shall have been fully satisfied. None of the undertakings, agreements, warranties, covenants and representations of Borrower contained in this Agreement or any of the other Financing Documents and no Event of Default by Borrower under this Agreement or any other Financing Documents shall be deemed to have been suspended or waived by Lender, unless such suspension or waiver is by an instrument in writing specifying such suspension or waiver and is signed by a duly authorized representative of Lender and directed to Borrower.

(c) If Lender shall accept performance by Borrower, in whole or in part, of any obligation that Borrower is required by any of the Financing Documents to perform only when a Default or Event of Default exists, or if Lender shall exercise any right or remedy under any of the Financing Documents that may not be exercised other than when a Default or Event of Default exists, Lender's acceptance of such performance by Borrower or Lender's exercise of any such right or remedy shall not operate to waive any such Event of Default or to preclude the exercise by Lender of any other right or remedy, unless otherwise expressly agreed in writing by Lender.

## ARTICLE 10
## MISCELLANEOUS

Section 10.1 Governmental Regulation. Anything contained in this Agreement to the contrary notwithstanding, Lender shall not be obligated to extend credit to Borrower in violation of any limitation or prohibition included in any Law which becomes applicable after the date of this Agreement.

Section 10.2 Performance of Obligations. Borrower agrees that Lender may, but shall have no obligation to (a) at any time, pay or discharge Taxes, liens, security interests or other encumbrances levied or placed on or threatened against any Collateral and (b) after the occurrence and during the continuance of an Event of Default, make any other payment or perform any act required of Borrower under any Financing Document or take any other action which Lender in its discretion deems necessary or desirable to protect or preserve the Collateral or enhance the likelihood of repayment of the Obligations. Lender shall use its reasonable efforts to give Borrower five business (5) days notice of any action taken under this Section 10.2 prior to the taking of such action or promptly thereafter *provided* the failure to give such notice shall not affect the obligations of Lender or Borrower in respect thereof. Borrower agrees to pay Lender, upon demand, the principal amount of all funds advanced by Lender under this Section 10.2, together with interest thereon at the Base Rate from the date of such advance until the outstanding principal balance thereof is paid in full.

Section 10.3 Headings. Section headings in the Financing Documents are for convenience of reference only, and shall not govern the interpretation of any of the provisions of the Financing Documents.

Section 10.4 Amendments. Any amendment or modification to this Agreement shall not be binding *unless* executed by Borrower and Lender.

Section 10.5 Benefits of this Agreement. This Agreement shall not be construed so as to confer any right or benefit upon any Person other than the parties to this Agreement and their respective successors and assigns.

Section 10.6 Severability of Provisions. Any provision in any Financing Document that is held to be inoperative, unenforceable, or invalid in any jurisdiction shall, as to that jurisdiction, be inoperative, unenforceable, or invalid without affecting the remaining provisions in that jurisdiction or the operation, enforceability, or validity of that provision in any other jurisdiction, and to this end the provisions of all Financing Documents are declared to be severable.

Section 10.7 Governing Law. The internal laws of the State of Kansas and the applicable federal laws of the United States shall govern the validity, construction, enforcement and interpretation of this Agreement and the other Financing Documents, except to the extent the Laws of any jurisdiction where Collateral is located require application of such Laws with respect to such Collateral.

Section 10.8 No Strict Construction. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

Section 10.9 Business Loans. Borrower, on behalf of itself, the Debtor and the Debtor's estate, warrants and represents that the Post-Petition Loans are and shall be for business, commercial, investment or other similar purposes and not primarily for personal, family, household or agricultural use.

Section 10.10 No Responsibility for Loans, Creditworthiness, Collateral, Recitals, Etc. Neither Lender nor any of its directors, officers, agents, attorneys or employees shall be responsible to any Person for, or have any duty to any Person to ascertain, inquire into or verify,

(a) any statement, warranty or representation made in connection with any Financing Document, (b) the performance or observance of any of the covenants or agreements of Borrower under any Financing Document, (c) the satisfaction of any condition specified herein, (d) the existence or possible existence of any Default or Event of Default or (e) the validity, effectiveness or genuineness of any Financing Document or any other instrument or writing furnished in connection therewith. Neither Lender nor any of its directors, officers, agents, attorneys or employees shall be responsible to any Person for any recitals, statements, representations or warranties herein or in any of the other Financing Documents, for the perfection or priority of any of the Liens on any of the Collateral, or for the execution, effectiveness, genuineness, validity, legality, enforceability, collectability or sufficiency of this Agreement or any of the other Financing Documents or the transactions contemplated thereby, or for the financial condition of the Debtor.

Section 10.11 Reliance on Documents; Counsel. Lender shall be entitled to rely upon any note, notice, consent, certificate, affidavit, letter, telegram, statement, paper or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and, in respect to legal matters, upon the opinion of counsel selected by Lender, which counsel may be employees of Lender.

Section 10.12 Notices. All notices, requests and other communications provided for herein, including any modifications of, or waivers, requests or consents under, this Agreement and the other Financing Documents shall be given or made in writing (including by telecopy) and delivered to the intended recipient at the "Address for Notices" specified below; or, as to any party, at such other address as shall be designated by such party in a notice to the other party. All such communications shall be deemed to have been duly given (a) when personally delivered, including by overnight mail or courier service, (b) in the case of notice by United States mail, certified or registered, postage prepaid, return receipt requested, upon receipt thereof, or (c) in the case of notice by telecopy, upon transmission thereof; *provided,* that such transmission is promptly confirmed by either of the methods set forth in clauses (a) or (b) above in each case given or addressed as provided for herein. The address for notices of each of the parties is:

LENDER:

SAFETY VISION, LLC
c/o Bruce Smith, President
6100 W. Sam Houston Pkway N.
Houston, Texas 77041

With a copy to:

Trent L. Rosenthal
1300 Post Oak Boulevard
25th Floor
Houston, Texas 77056
Telephone: (713) 871-6860
Facsimile: (713) 960-1527

BORROWER:

ICOP Digital, Inc.
c/o David Owen, CEO
16801 W. 116th Street
Lenexa, KS 66219

with a copy to:

Joanne B. Stutz
Tom Mullinix

John E. Larson
EVANS & MULLINIX, PA
7225 Renner Road, Ste. 200
Shawnee, KS 66217
Telephone: (913) 962-8700
Facsimile:: (913) 962-8701

Section 10.13 Counterparts. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one agreement, and any of the parties hereto may execute this Agreement by signing any such counterpart. This Agreement shall be effective when (a) it has been executed by Borrower and Lender and (b) Section 8.1 has been complied with.

Section 10.14 Successor and Assigns. This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns; *provided* that neither party may assign any of its rights or obligations under this Agreement or any other Financing Document without the prior written consent of the other party, and, to the extent required, Court approval.

Section 10.15 ENTIRE AGREEMENT. THIS AGREEMENT AND THE OTHER FINANCING DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

***[The remainder of this page is intentionally left blank. Signature pages follow.]***

## APPENDIX A
## GENERAL DEFINITIONS; MATTERS OF CONSTRUCTION

When used in the Debtor-in-Possession Credit Agreement dated as of November 30, 2009, by and between **ICOP DIGITAL, INC.** debtor and debtor-in-possession, a Colorado corporation, as Borrower and Safety Vision, LLC, a Texas corporation, as Lender, (a) the following terms shall have the meanings as defined in the UCC: "Account", "Chattel Paper", "Commercial Tort Claims", "Deposit Accounts", "Documents", "Equipment", "General Intangibles", "Instruments", "Investment Property", "Letter-of-Credit Rights" and "Securities" and (b) the following terms shall have the following meanings (terms defined in the singular to have the same meaning when used in the plural and vice versa):

**Affiliate** – of (a) any Person means any other Person directly or indirectly controlling, controlled by or under common control with such Person and (b) in addition, the Debtor means any Person who is, or during the 24 months preceding the date of determination has been, an officer or director (or any person who is at the time in question or was during such period a relative (by consanguinity or marriage) of any such officer or director) of the Debtor or any Affiliate of the Debtor and any Entity directly or indirectly controlled by any such Person or by any such relative or in which any such Person or any such relative owns, beneficially or of record, 10% or more of any class of voting securities (or other voting interests). A Person shall be deemed to control another Person if the controlling Person is the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act) of 10% or more of any class of voting securities (or other voting interests) of the controlled Person or possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of the controlled Person, whether through ownership of equity interests, by contract or otherwise.

**Agreement** – as defined in the Preamble to this Agreement.

**Applicable Law** – all Laws or decrees of any Authority applicable to the Person, conduct, transaction, covenant or Financing Documents in question, including all applicable common law and equitable principles; and all provisions of all applicable state and federal constitutions, statutes, rules, regulations, judgments, decrees and orders of any Authority.

**Authority** – any (a) local, state, territorial, Federal or foreign judicial, executive, regulatory, administrative, legislative or governmental agency, board, bureau, authority, intellectual property registry, adjudicatory forum, tribunal, commission, department or other instrumentality or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government, (b) arbitrator or arbitration board or panel or (c) central bank.

**Bankruptcy Code** –Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

**Bankruptcy Orders** – collectively, the Interim Order and the Final Order, and **Bankruptcy Order** means either the Interim Order or the Final Order.

**Base Rate** – for any day, a rate per annum equal to five percent (5%).

**Borrower** – as defined in the Preamble to this Agreement.

**Borrowing** – a borrowing consisting of one or more Post-Petition Loans made or deemed made on the same day by Lender.

**Borrowing Date** – each date that a Post-Petition Loan is made or deemed made.

**Business Day** – any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of Texas or is a day on which banking institutions located in such state are closed.

**Chapter 11 Case** – as defined in the Recitals to this Agreement.

**Closing Date** - the date on which all of the conditions precedent in Section 8.1 of this Agreement are satisfied or specifically waived in writing by Lender.

**Collateral** – all of the Property and interests in Property of the Debtor and the Debtor's estate that are described in Article 6 of this Agreement, whether or not such Property or interest in Property was in existence on or acquired by the Debtor or the Debtor's estate prior to or after the Petition Date or the Closing Date.

**Commitment** – the obligation of Lender to make Post-Petition Loans pursuant to the terms and conditions of this Agreement in an aggregate principal amount not to exceed $500,000.

**Commitment Period** – as defined in Section 1.1 of this Agreement.

**Commitment Termination Date** – the date that is the earliest to occur of:

(a) the date that is sixty (60) days after the Closing Date;

(b) the date of Full Payment;

(c) the date on which any Liens securing the obligations under this Agreement are set aside or avoided or the claims thereunder are disallowed in any manner, in each case, in whole or in part;

(d) the date of consummation of the sale or disposition of all or substantially all of the assets of, or equity interests in, the Debtor's estate to any Person;

(e) the effective date of a plan of reorganization in the Chapter 11 Case;

(f) the date Lender terminates the Facility pursuant to Section 5.2(a) of this Agreement;

(g) the date the Court denies approval of the Letter of Intent by and between the Borrower and Lender, if same ever occurs; or

(h) the date on which Borrower elects to terminate this Agreement pursuant to Section 5.2(b) of this Agreement.

**Contracts** – all present and future contracts and agreements of the Debtor, including (a) all rights of the Debtor to receive moneys due and to become due to it thereunder or in connection therewith, (b) all rights of the Debtor to damages arising thereunder and (c) all rights of the Debtor to perform and exercise all remedies thereunder.

**Court** – as defined in the Recitals to this Agreement.

**Debtor** – means ICOP Digital, Inc. a Colorado corporation.

**Default** – an event or condition the occurrence of which would, with the lapse of time or the giving of notice, or both, become an Event of Default.

**Dollars** or $ – lawful money of the United States of America.

**Entity** – a corporation, limited liability company, association, partnership of any kind, organization, trust, estate, sole proprietorship, benefit plan, joint venture or other entity.

**Event of Default** – as defined in Section 9.1 of this Agreement.

**Exchange Act** – the Securities Exchange Act of 1934, as amended from time to time including (unless the context otherwise requires) any rules and regulations promulgated thereunder.

**Facility** – the secured facility established by Lender in favor of Borrower under Article 1 of this Agreement.

**Final Order** – a final order of the Court approving the Facility and resulting from and following the conclusion of a Final Hearing as such term is customarily used in FRBP 4001(c).

**Financing Documents** – this Agreement, the Note, the Security Documents, the Interim Order, the Final Order and any and all other agreements, instruments and documents executed on or after the date hereof by Borrower in favor of Lender with respect to any of the transactions contemplated by this Agreement.

**Full Payment** -- full and final payment of all Obligations (other than contingent surviving obligations in respect of which no claim or demand has been made) in cash or immediately available funds and the permanent reduction of the Commitment to zero Dollars ($0).

**GAAP** – generally accepted accounting principles in the United States as in effect from time to time.

**Interim Order** – an interim order of the Court approving the Facility and resulting from and following the conclusion of an Interim or Preliminary Hearing as such terms are customarily used in FRBP 4001(c).

**Inventory** – shall have the meaning ascribed to "inventory" in the UCC, as such definition may be amended from time to time including, in the case of the Debtor: (a) all goods intended for sale or lease by the Debtor, or for display or demonstration; (b) all work in process;

(c) all raw materials and other materials and supplies of every nature and description used or which might be used in connection with the manufacture, printing, packing, shipping, advertising, selling, leasing or furnishing of such goods or otherwise used or consumed in the Debtor's business; and (d) all documents, instruments or agreements evidencing any General Intangibles relating to any of the foregoing, whether now owned or hereafter acquired by the Debtor.

**Law** – collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Authority, in each case whether or not having the force of law.

**Lender** – as defined in the Preamble to this Agreement.

**L ien** – any lien (statutory or other), mortgage, deed of trust, pledge, hypothecation, assignment, encumbrance, security interest or security agreement or preferential arrangements of any kind or nature whatsoever (including the interest of a vendor or lessor under any conditional sale, capitalized lease or other title retention agreement).

**Note** – a promissory note to be executed by Borrower in favor of Lender in the form of Exhibit A to this Agreement, which shall be in the face amount of the Commitment and which shall evidence all Post-Petition Loans (including the Existing Post-Petition Loans) made by Lender to Borrower pursuant to this Agreement.

**Notice of Borrowing** – as defined in Section 3.1(a) of this Agreement.

**Obligations** – in each case, whether now in existence or hereafter arising, (a) the principal of, and interest on, the Post-Petition Loans; and (b) all other debts, covenants, duties and obligations now or at any time or times hereafter owing by Borrower to Lender under or pursuant to this Agreement or any of the other Financing Documents, whether evidenced by any note or other writing, whether arising from any extension of credit, loan, guaranty, indemnification or otherwise and whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, or joint or several, including all interest, charges, expenses, fees or other sums chargeable to Borrower hereunder or under any of the other Financing Documents.

**Person** – an individual, trustee, custodian, executor, administrator, nominee, representative, tribunal, an Authority or an Entity.

**Petition Date** – the date of the commencement of the Chapter 11 Case.

**Post-Petition Loan** – a loan (including the Existing Post-Petition Loans) made by Lender as provided in Section 1.1 of this Agreement.

**Property** – any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

**Security Documents** – A Consent and Estoppel, substantially in the form attached hereto as Exhibit C , a Lockbox Agreement in the form attached hereto as Exhibit C, and any and all other instruments and agreements now or at any time hereafter securing all or any part of the Obligations.

**Taxes** – all taxes, charges, fees, duties, levies, penalties or other assessments imposed by any Authority, including income, unrelated business income, gross receipts, excise, property, sales, gains, use, license, capital stock, transfer, franchise, payroll, withholding, social security or other taxes, including any interest, penalties or additions attributable thereto (whether or not disputed).

**UCC** - the Uniform Commercial Code (or any successor statute) as adopted and in force in the State of Texas or, when the Laws of any other state govern the method or manner of the creation or perfection of any security interest in any of the Collateral, the Uniform Commercial Code (or any successor statute) of such state.

The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, paragraph, subdivision, Schedule or Exhibit. Any pronoun used shall be deemed to cover all genders. In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding." The Section titles, table of contents and list of Exhibits appear as a matter of convenience only and shall not affect the interpretation of this Agreement. All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations; to any of the Financing Documents shall include any and all amendment or modifications thereto and any and all restatements, extensions or renewals thereof; all references to any Person shall mean and include the successors and permitted assigns of such Person; all references to "including" and "include" shall be understood to mean "including, without limitation;" and to the time of day shall mean Central time (daylight or standard, as applicable), unless otherwise expressly provided in this Agreement.

***[The remainder of this page is intentionally left blank.]***

## EXHIBIT A

## FORM OF NOTE

U.S. $500,000 January _, 2011

FOR VALUE RECEIVED, the undersigned (hereinafter referred to as "**Borrower**"), hereby unconditionally promises to pay to the order of Safety Vision, LLC, a Texas limited liability company ("Lender"), on or prior to the Commitment Termination Date, the principal sum of Five Hundred Thousand and No/100 Dollars ($500,000), or such lesser sum as may constitute the outstanding principal amount of all Post-Petition Loans pursuant to the terms of the Credit Agreement referred to below. Borrower likewise unconditionally promises to pay to Lender interest on the outstanding principal amount of Post-Petition Loans at such interest rates, payable at such times, and computed in such manner as are specified in the Credit Agreement, in strict accordance with the terms thereof.

This Note (this "**Note**") is issued pursuant to, and is the "Note" referred to in, the Debtor-in-Possession Credit Agreement dated as of January __, 2011, between Borrower and Lender (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), and Lender is and shall be entitled to all benefits thereof and of all Financing Documents executed and delivered in connection therewith. The provisions of the Credit Agreement are incorporated herein by this reference. All capitalized terms used herein, unless otherwise defined herein, shall have the meanings ascribed to such terms in the Credit Agreement.

The repayment of the principal balance of this Note is subject to the provisions of Sections 4.2, 4.5 and 5.2(c) of the Credit Agreement. The entire unpaid principal balance and all accrued interest on this Note shall be due and payable on the Commitment Termination Date as set forth in Section 5.2(c) of the Credit Agreement.

All payments of principal and interest shall be made in Dollars in immediately available funds as specified in the Credit Agreement.

All principal amounts of Post-Petition Loans made by Lender to Borrower pursuant to the Credit Agreement, and all accrued and unpaid interest thereon, shall be deemed outstanding under this Note and shall continue to be owing by Borrower in accordance with the terms of this Note and the Credit Agreement.

To the fullest extent permitted by Applicable Law, Borrower, for itself and its legal representatives, successors and assigns, expressly waive presentment, demand, protest, notice of dishonor, notice of non-payment, notice of acceleration and intent to accelerate, notice of maturity, notice of protest, presentment for the purpose of accelerating maturity, diligence in collection, and the benefit of any exemption or insolvency Laws.

Wherever possible each provision of this Note shall be interpreted in such a manner as to be effective and valid under Applicable Law, but if any provision of this Note shall be prohibited or invalid under Applicable Law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or remaining provisions of this Note. No delay or failure on the part of Lender in the exercise of any right or

remedy hereunder shall operate as a waiver thereof, nor as an acquiescence in any default, nor shall any single or partial exercise by Lender of any right or remedy preclude any other right or remedy. Lender, at its option, may enforce its rights against any Collateral securing this Note without enforcing its rights against Borrower or any other property or indebtedness due or to become due to Borrower. Borrower agrees that, without releasing or impairing Borrower's liability hereunder, Lender may at any time release, surrender, substitute or exchange any Collateral securing this Note and may at any time release any party primarily or secondarily liable for the indebtedness evidenced by this Note.

The rights and obligations of Lender and Borrower hereunder shall be construed in accordance with and governed by the laws (without giving effect to the conflict of law principles thereof) of the State of Texas.

IN WITNESS WHEREOF, Borrower has caused this Note to be executed and delivered on the date first above written.

**BORROWER**
**ICOP DIGITAL, INC. DEBTOR AND DEBTOR IN POSSESSION**

By:____________________________
Name:__________________________
Title: __________________________

# EXHIBIT B

## FORM OF NOTICE OF BORROWING

_______________ , 2011

RE: Debtor-in-Possession Credit Agreement dated as of __________ (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and between ("**Borrower**") and _________, a Texas corporation ("**Lender**")

Ladies and Gentlemen:

This Notice of Borrowing is delivered to you pursuant to Section 3.1(a) of the Credit Agreement. Unless otherwise defined herein, capitalized terms used herein shall have the meanings attributable thereto in the Credit Agreement. Borrower hereby requests a Post-Petition Loan in the principal amount of $_________ to be made on_________ 2011, by wire transfer to the following account:

Bank Name: ________________________
ABA No.: __________________________
Account Title:______________________
Account No.:_______________________

and to be used for the following purposes:

[SPECIFY PROPOSED USE OF PROCEEDS]

Borrower hereby certifies that, as of the date hereof and the proposed Borrowing Date, both before and after giving effect to the proposed Post-Petition Loan, no Default or Event of Default has occurred and is continuing. Borrower hereby ratifies and reaffirms all of the Financing Documents and all Obligations arising thereunder.

EXHIBIT C

# CONSENT AND ESTOPPEL

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to induce JPMORGAN CHASE BANK, N.A. ("Lender") to make financial concessions to SAFETY VISION, L.L.C. ("Borrower"), a ____________ limited liability company, ICOP DIGITAL, INC. ("ICOP"), a Colorado corporation, hereby certifies, represents, warrants and agrees as follows with respect to the documentation described on Exhibit A attached hereto (collectively the "Pledged Documents"):

The Pledged Documents have been duly executed and delivered and the obligations of ICOP under the Pledged Documents are enforceable by Lender.

The obligations of ICOP under the Pledged Documents may be enforced against ICOP without regard to the validity, regularity or enforceability of any loan documents related to indebtedness of Borrower to Lender and ICOP's obligations under the Pledged Documents shall in no way be terminated, affected or impaired by reason of Lender's assertion of any rights or remedies which Lender may have under or in respect to any loan document related to indebtedness of Borrower to Lender against any person obligated thereunder, or by reason of the failure of Lender to exercise or delay in exercising any such right or remedy or by reason of the adjudication of bankruptcy of any person obligated thereunder, the commencement of a case in bankruptcy by or against any such person or the death, legal incompetency, dissolution, liquidation or termination of any such person, or by an extension or renewal of, or an amendment, modification or supplement to, any loan document related to indebtedness of Borrower to Lender or by the release or exchange of any property held as collateral thereunder or other forbearances and indulgences granted under any such loan document.

As of the date hereof, (i) there are no claims, set-offs or defenses to the obligations of ICOP under the Pledged Documents, (ii) Borrower is not in default in the performance of any of its obligations under the Pledged Documents or any document relating thereto, and (iii) no event has occurred which with the passage of time or the giving of notice, or both, would constitute such a default or which would or might excuse ICOP from any of ICOP's obligations under the Pledged Documents.

There has been no release, discharge, satisfaction or cancellation of the liabilities or obligations of ICOP under the Pledged Documents.

All payments on the Pledged Documents will be made by delivering such payments to Lender at JPMorgan Chase Bank, N.A., 712 Main Street, Houston, Texas 77002.

True, correct and complete copies of the Pledged Documents have been delivered to Lender. The Pledged Documents are in full force and effect and have not been modified in any fashion or to any extent. ICOP will not modify the Pledged Documents in any fashion or to any extent without the express prior written consent of Lender.

*Signature Page*

Lender may at any time, and without notice to or consent of ICOP, assign, transfer or convey all or any part of its rights and privileges with respect the Pledged Documents to any person or entity.

The Pledged Documents embody the entire agreement and understanding between ICOP and Borrower and other parties with respect to the subject matter thereof and supersede all prior conflicting or inconsistent agreements, consents and understandings relating to such subject matter. ICOP acknowledges and agrees that there is no oral agreement between ICOP and Borrower which has not been incorporated in the Pledged Documents.

ICOP shall, upon request by Lender from time to time, (i) update the representations and warranties herein set forth and (ii) certify as to the then current unpaid principal balance of the promissory note included in the Pledged Documents.

EXECUTED as of January ____, 2011.

ICOP DIGITAL, INC.,
a Colorado corporation

By:________________________________
David C. Owen,
Chairman and CEO

Exhibit A - Pledged Documents

EXHIBIT D

**LOCKBOX AGREEMENT**

THIS LOCKBOX AGREEMENT ("**Agreement**") is executed as of the _____ day of January, 2011, between SAFETY VISION, LLC, a Texas limited liability company ("**Lender**") and ICOP DIGITAL, INC., a Colorado Corporation ("**Debtor**" or "**Borrower**").

WITNESSETH:

WHEREAS, on January 21, 2011, Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Kansas (the "Court"), commencing the case ("**the Chapter 11 Case**"). Debtor has remained a debtor and debtor-in-possession; and

WHEREAS, Borrower has requested that Lender extend a secured multi-draw term facility pursuant to the terms of that certain Debtor-In-Possession Credit Agreement, ("**the DIP Credit Agreement**") to fund certain post-petition expenses as set forth on and consistent with the budget attached thereto, ("**the Budget**"); and

WHEREAS, the DIP Credit Agreement encumbers substantially all of the assets of the Borrower as more fully described in the DIP Credit Agreement ("**the Collateral**"); and

WHEREAS, the parties now wish to enter into this agreement to set forth certain agreements of the parties regarding the collection and use of accounts receivable or other revenues received with respect to the Collateral.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged here, the parties here agree as follows:

**1. Deposits.** All accounts receivable ("**Receipts**") shall be collected by Borrower and any Receipts received by or currently held by Borrower shall immediately be deposited in the Account, as defined below.

**2. Assignment.** Borrower, to secure its obligations under the DIP Credit Agreement and any Note created thereunder (collectively, "**the Secured Obligations**"), does grant to Lender a security interest in, and assign and transfer to and pledge with Lender all right, title, and interest (whether legal, equitable or beneficial) of Borrower in and to the security described below (collectively, "**the Account Collateral**"):

> Account No. _________*(the "Account")* with or payable by _________ Bank (the "Bank") at its office at _________, Kansas _________ in the name of Borrower, including all sums now or at any time hereafter on deposit in the Account and all sums due or to become due on the Account (including interest), and any proceeds of and replacements of the Account.

3. **Withdrawals.**

a. **Before Default.** Before the occurrence of an Event of Default (as defined below), withdrawals or disbursements of funds in the Account shall be made by Borrower. Borrower shall only use amounts withdrawn or disbursed from the Account as follows: (i) to pay post-petition expenses, including monthly payroll and taxes, and professional fees and expenses incurred in connection with the administration and preservation of the bankruptcy estate of the Debtor, (B) to pay amounts detailed on the Budget, including payoff of the Existing Pre-Petition Loans as provided for in the DIP Credit Agreement.

b. **After Default.** Upon the occurrence of an Event of Default, Lender may give notice of the Event of Default to Bank and thereafter withdrawals or disbursements from the account may be made only by Lender or as directed by the Court.

4. **Financial Reporting.**

a. **Reports.** Borrower shall submit weekly reports to Lender on the collection of accounts receivable and such other matters as Lender may request or as otherwise required pursuant to the terms of the DIP Facility Agreement. Such reports shall be accompanied by copies of invoices, checks, bank notices, and statements relating to the Account, and such other supporting documents as Lender shall request. Lender shall have the right to conduct an audit at Borrower's expense of the matters set forth in the reports and Borrower shall cooperate with Lender in performing the audit and shall make available such of its books and records relating to the Collateral as Lender shall reasonably request.

b. **Meetings.** At Lender's request, Borrower shall consult with Lender regarding financial issues affecting the Collateral from time to time. Lender shall not, however, have any right or authority to direct or control Borrower in the operation of its business.

5. **Power of Attorney.** Borrower constitutes and irrevocably appoints Lender the true and lawful attorney of Borrower, with full power of substitution, to ask, demand, collect, receive, or receipt for any and all amounts which may be or become due and payable under the Account, to execute any and all checks, drafts, withdrawal statements, receipts, or other orders for the payment of money drawn on the Account, and to endorse the name of Borrower on all commercial paper given in payment or in part payment, and in its discretion to file any claim or take any other action or proceeding, either in its own name or in the name of Borrower or otherwise, which Lender may deem necessary or appropriate to protect and preserve the security interest of Lender under this Agreement.

6. **Events of Default.** As used in this Agreement, the term **"Event of Default"** shall mean any one or more of the following:

a. An Event of Default as defined in the DIP Credit Agreement.

b. The failure by Borrower or Borrower to keep or perform any of the terms or provisions of this Agreement.

c. The levy of any attachment, execution, or other process against Borrower of all or any part of the Account Collateral.

**7. Remedies.** Upon the occurrence of an Event of Default, Lender may at any time and from time to time and without demand or notice, withdraw and receive the Account Collateral up to the outstanding amount of the Secured Obligations, and apply the proceeds (including any interest) to the Secured Obligations. If there is a deficiency, Borrower covenants and agrees promptly to pay the same to Lender. Borrower acknowledges that the Account is a deposit account denominated in dollars and that a sale of it is unnecessary to establish or realize upon the value of it. Borrower agrees that the disposition of the Account Collateral as set forth above is a commercially reasonable disposition of the Account Collateral and waives any rights it may have to receive notice of any such withdrawals or disbursements or to require a sale of the Account at a public or private sale.

**8. Waivers.** Borrower waives any right to require Lender to (a) make or give any presentment, demands for performances, notices of nonperformance, protests, notices of protest, or notices of dishonor in connection with the Secured Obligations or the withdrawal of the Account Collateral, (b) proceed against or exhaust any other collateral, or (c) pursue any other remedy in Lender's power.

**9. Termination.** This Agreement shall remain in full force and effect until all Secured Obligations are indefeasibly satisfied in full.

**10. Representation and Covenants.** Borrower represents, warrants, and covenants that ownership of the Account Collateral is free and clear of all liens and encumbrances of any nature whatsoever and shall remain so during the term of this Agreement. Borrower will not attempt to withdraw the Account Collateral and will not attempt to amend or supplement the instructions to the Bank set forth in this Agreement and in the Notice of Security Interest without the prior written consent of Lender.

**11. Acknowledgments.** Borrower acknowledges and agrees that Lender shall not be liable for any actions or inactions of Borrower. Borrower also acknowledges and agrees that nothing herein shall be deemed to modify the terms or conditions of the DIP Credit Agreement or the other documents executed in connection therewith, including, without limitation, the provisions relating to the payment of interest and the disbursement of additional loan proceeds. To the extent that there exist any conflict between the terms of this Agreement and the terms of the DIP Credit Agreement, the terms of the DIP Credit Agreement shall control and the terms of this Agreement shall be deemed to be modified in accordance therewith.

**12. Further Assurances.** Borrower shall execute and deliver such further assignments, notices, and other documents as Lender may reasonably require from time to time to better assure, assign, and transfer to Lender the rights now or hereafter intended to be granted

to Lender under this Agreement for carrying out the intention of facilitating the performance of the terms of this Assignment.

**13. Costs and Expenses.** All costs and expenses, including reasonable attorneys' fees, incurred or paid by Lender in exercising any right, power, or remedy conferred by this Agreement or in the enforcement thereof, shall become a part of the Secured Obligations, shall be secured by the Account Collateral, and shall be paid to Lender by Borrower immediately upon demand.

**14. Miscellaneous.** The rights, powers, and remedies of Lender under this Agreement shall be in addition to all rights, powers, and remedies of Lender at law or under the DIP Credit Agreement or any other agreement or instrument. Any forbearance or failure or delay by Lender in exercising any right, power, or remedy under this Agreement shall not be deemed to be a waiver of such right, power, or remedy, and any single or partial exercise of any right, power, or remedy under this Agreement shall not preclude the further exercise of it. This Agreement and all representations and warranties, powers, and rights it contains are binding upon and shall inure to the benefit of the parties here and their respective successors and assigns.

**15. Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Kansas.

**16. Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, this Agreement has been duly executed on the day and year specified at the beginning of this Agreement.

**BORROWER:**

**ICOP DIGITAL, INC.,**
Debtor and Debtor in Possession

By: ______________________________
Name: ______________________________
Title: ______________________________

**LENDER:**

**SAFETY VISION, LLC**

By: ______________________________
Name: ______________________________
Title: ______________________________



1301784v.1 iManage 110767

## ICOP Expenses Through Chapter 11

| PAYABLE | | 1/17/11 Cash Advance | Due Now | Feb | Mar | April | TOTAL |
|---|---|---|---|---|---|---|---|
| 116 Renner Partners | Rent | | $ 12,000.00 | $ 17,000.00 | $ 17,000.00 | $ 17,000.00 | |
| Meritex (Caves) | Rent | | $ 2,550.00 | $ 2,550.00 | $ 2,550.00 | $ 2,550.00 | |
| **SUB-TOTAL** | | | **$ 14,550.00** | **$ 19,550.00** | **$ 19,550.00** | **$ 19,550.00** | **$ 73,200.00** |
| Atmos Energy | Gas | $ 460.15 | $ 1,000.00 | $ 500.00 | $ 500.00 | $ 500.00 | |
| AT&T | Phone | $ 260.25 | $ - | $ 50.00 | $ 50.00 | $ 50.00 | |
| Conference America | Phone | $ 315.26 | $ - | $ 100.00 | $ 100.00 | $ 100.00 | |
| JC Wastewater | Sewer | $ 12.68 | $ - | $ 15.00 | $ 15.00 | $ 15.00 | |
| KCP&L | Electric | $ 2,000.00 | $ 2,000.00 | $ 2,000.00 | $ 2,000.00 | $ 2,000.00 | |
| Sprint | Phone | $ 4,151.45 | $ 3,000.00 | $ 1,800.00 | $ 1,800.00 | $ 1,800.00 | |
| TW Telecom | Internet | $ 1,700.00 | $ 2,000.00 | $ 1,600.00 | $ 1,600.00 | $ 1,600.00 | |
| Water One | Water | $ 98.14 | $ - | $ 50.00 | $ 50.00 | $ 50.00 | |
| **SUB-TOTAL** | | **$ 8,997.93** | | **$ 6,115.00** | **$ 6,115.00** | **$ 6,115.00** | **$ 18,345.00** |
| Evans & Mullinix | Legal | $ 5,000.00 | $ 20,000.00 | $ 25,000.00 | 25,000.00 | $ 25,000.00 | |
| Marc Salle | Legal | | $ 15,000.00 | $ 10,000.00 | $ 10,000.00 | $ 15,000.00 | |
| D&O Extension | Insurance | | $ 40,000.00 | | | | |
| Computershare | Xfr Agent | | $ 1,500.00 | $ 500.00 | $ 500.00 | $ 500.00 | |
| Chapter 11 Filing | Legal | | $ 1,500.00 | $ - | $ - | $ - | |
| **SUB-TOTAL** | | **$ 5,000.00** | **$ 78,000.00** | **$ 35,500.00** | **$ 10,500.00** | **$ 40,500.00** | **$ 164,500.00** |
| First Growth Capital | Loan | | $ 150,000.00 | $ - | $ - | $ - | |
| 3 Days Payroll | | | $ 35,000.00 | | | | |
| CBIZ | W-2s | | $ 500.00 | | | | |
| CBIZ: Q1 | Insurance | | $ 10,000.00 | | | | |
| Human Resources | | | $ 1,000.00 | $ 2,500.00 | $ 2,500.00 | $ 2,500.00 | |
| David Owen | | | $ 10,000.00 | | | | |
| Laura Owen | | | $ 10,000.00 | | | | |
| Mickie Koslofsky | | | $ 2,500.00 | | | | |
| Misc. Labor | | | | $ 2,500.00 | $ 2,500.00 | $ 2,500.00 | |
| Misc. Expenses | | $ 1,002.07 | | $ 2,500.00 | $ 2,500.00 | $ 2,500.00 | |
| **SUB-TOTAL** | | | **$ 219,000.00** | **$ 7,500.00** | **$ 7,500.00** | **$ 7,500.00** | **$ 241,500.00** |
| **TOTAL** | | **$ 15,000.00** | **$ 311,550.00** | **$ 68,665.00** | **$ 43,665.00** | **$ 73,665.00** | **$ 497,545.00** |

**This is an estimate based on the best information we have today, and conditions may change in actual allocation of funds.**

**ICOP®**

**ADVANCING SURVEILLANCE TECHNOLOGY**

Via Facsimile: 713.896.6640
Total Pages: 1

January 18, 2011

Bruce H. Smith
President/CEO
Safety Vision, LP
6100 West Sam Houston Parkway North
Houston, Texas 77041

Bruce:

ICOP Digital, Inc. and Safety Vision have entered into a letter of intent agreement, for the sale of certain assets to Safety Vision. To facilitate the sale and to meet emergency expenses to be incurred the day before the Chapter 11 filing of ICOP, ICOP has requested an advance from Safety Vision in the amount of $15,000 and Safety Vision has concurrently wired the money to ICOP as a gesture of good will and without any legal obligation to do so. Assuming the Transaction in the Letter of Intent agreement closes, the $15,000 shall constitute an advance against the Purchase Price (as defined in the Letter of Intent agreement) at Closing. If the Transaction does not close, ICOP promises to pay $15,000 to Safety Vision, and Safety Vision shall be a creditor for the same. Also, the loan may be rolled up into to DIP Credit Facility, in which case it will be repaid and will not be credited as an advance against the Purchase Price.

Thank you.

Sincerely,

David C. Owen
Chairman and CEO

ICOP Digital, Inc. 16801 West 116th Street, Lenexa, KS 66219, USA
Sales: 866.210.ICOP (4267) • Support: 866.621.5500 • Headquarters: 913.338.5550
Fax: 913.312.0264 • www.ICOP.com

Exhibit B

BS

# EXHIBIT A

ALL THAT PART OF THE SOUTHWEST QUARTER OF SECTION 8, TOWNSHIP 13, RANGE 24, IN T
LENEXA, JOHNSON COUNTY, KANSAS, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTH
OF THE SOUTHWEST QUARTER OF SAID SECTION 8; THENCE NORTH 88 DEGREES 02 MINUTES
EAST ALONG THE SOUTH LINE OF THE SOUTHWEST QUARTER OF SAID SECTION 8, A DISTANC
FEET; THENCE NORTH 01 DEGREES 57 MINUTES 10 SECONDS WEST, A DISTANCE OF 55.00 FE
POINT OF BEGINNING, SAID POINT BEING ON THE NORTH RIGHT OF WAY LINE OF COLLEGE B
NOW ESTABLISHED; THENCE CONTINUING NORTH 01 DEGREES 57 MINUTES 10 SECONDS WE
OF 451.78 FEET; THENCE SOUTH 87 DEGREES 38 MINUTES 58 SECONDS WEST, A DISTANCE O
THENCE NORTH 14 DEGREES 27 MINUTES 36 SECONDS WEST, A DISTANCE OF 414.07 FEET; T
64 DEGREES 54 MINUTES 01 SECONDS EAST, A DISTANCE OF 77.45 FEET; THENCE NORTH 18
MINUTES 33 SECONDS WEST, A DISTANCE OF 32.01 FEET; THENCE NORTH 33 DEGREES 37 MI
SECONDS WEST, A DISTANCE OF 478.20 FEET; THENCE NORTH 51 DEGREES 15 MINUTES 25 S
A DISTANCE OF 155.36 FEET TO A POINT ON THE EAST LINE OF RENNER BOULEVARD AS NOW
THENCE SOUTH 02 DEGREES 10 MINUTES 25 SECONDS EAST ALONG SAID EAST RIGHT OF WA
DISTANCE OF 1394.45 FEET; THENCE SOUTH 47 DEGREES 03 MINUTES 50 SECONDS EAST, A D
42.51 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF SAID COLLEGE BOULEVARD; T
88 DEGREES 02 MINUTES 50 SECONDS EAST ALONG SAID RIGHT OF WAY LINE, A DISTANCE OI
TO THE POINT OF BEGINNING.



Exhibit C