The relief described hereinbelow is SO ORDERED.

Signed January 30, 2011.

ROBERT D. BERGER
United States Bankruptcy Judge

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS
KANSAS CITY DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 11-20140-11-rdb |
| ICOP DIGITAL, INC. | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

**ORDER APPROVING (I) LETTER OF INTENT AND PURCHASER PROTECTION PROVISIONS, (II) SALE PROCEDURE AND FORM OF NOTICE, AND (II) CERTAIN BID PROTECTIONS**
**(Related Docket No. 3)**

On the 28th day of January, 2011, the Court conducted a hearing on the Debtor's Expedited Motion to Approve (i) Letter of Intent and Purchaser Protection Provisions, (ii) Sale Procedure and Form of Notice, and (iii) Certain Bid Protections ("**the Motion**"**).** The following appearances were noted on the record: Joanne B. Stutz, Thomas M. Mullinix and John E. Larson of Evans & Mullinix, P.A. as counsel for the Debtor; Scott A. Wissel of Lewis, Rice & Fingersh, L.C. and Trent L. Rosenthal of Beirne Maynard & Parsons, LLP as counsel for Safety Vision, LLC; and George D. Halper of McAnany, Van Cleave & Phillips, P.A. as counsel for Bank of Blue Valley. There were no other parties in attendance.

The Court finds that notice of the Motion is sufficient under the circumstances; the requested relief is appropriate, and the bid protections are reasonable and consistent with the proper exercise of the Debtor's business judgment. All initially capitalized terms used herein shall have the same meaning assigned in the Motion.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

1. The relief requested in the Motion is **GRANTED.** The Letter of Intent (**LOI**), in the form attached hereto, including the Purchaser Protection Provisions described in paragraph 12 of the LOI (including, without limitation, the Break-Up Fee or Termination Fee, and Reimbursable Expenses), are hereby approved and the Debtor is authorized to enter into the LOI, which shall be binding on the Debtor in accordance with its terms. As provided in paragraph 12(g) of the LOI, the Break-Up Fee and/or Termination or Termination Fee, and Reimbursable Expenses shall constitute administrative expenses of Seller and are granted administrative expense priority pursuant to Section 503 of the Bankruptcy Code if and when due. However, notwithstanding anything contained herein to the contrary, the liens of SV securing the Credit Facility on the Debtor's real estate, consisting of approximately 11.64 acres at the Northwest corner of College & Renner, Olathe, Kansas, and in the deposit accounts shall be junior to and inferior to the liens held by Bank of Blue Valley in the real property and in the deposit account maintained at Bank of Blue Valley.

2. Within five (5) business days following the entry of this Order, the Debtor will serve by ECF, email, telefax or first class mail a notice containing the date of the final sale hearing to: (i) all potential purchasers that have expressed an interest to the Debtor in purchasing the Assets ("**the Potential Purchasers**"); (ii) the Office of the United States Trustee; (iii) counsel for Safety Vision, LLC; (iv) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the offices of the Attorneys General for the States of Washington, Minnesota, North Carolina, South Carolina and California; (vi) the offices of the Treasurers for the States of Washington, Minnesota, North Carolina, South Carolina and California; (vii) holders of the Debtor's 20 largest unsecured claims; (viii) the Stock Transfer Agent; (iv) the NOBO list; and (v) all parties requesting notice.

3. Only Qualified Bidders may participate in the bidding process. To become a Qualified Bidder, a potential bidder must on or before 5:00 p.m. Central Standard Time on February 25, 2011, (i) have executed and delivered to the Debtor a confidentiality agreement prepared by the Debtor, which confidentiality agreement is a prerequisite to obtaining access to due diligence materials, (ii) deposit with the Debtor's counsel the sum of $10,000.00 (each, "**the Alternative Buyer's Deposit**") which deposit shall be nonrefundable unless such Qualified Bidder's bid is not the highest and best offer as determined by the Court; (iii) submit to the Debtor an unqualified and binding bid in the minimum amount of $1,000,000.00 cash, plus fifty percent (50%) of the Accounts, along with an executed written agreement substantially in the form of the Asset Purchase Agreement[1] ("**Qualified Bids**"); and (iv) provide financial and other information to the Debtor that allows the Debtor to make a reasonable determination as to such bidder's ability to consummate a sale as contemplated herein. Safety Vision, LLC is and shall be

[1] A copy of the proposed Asset Purchase Agreement may be obtained from Debtor's counsel and any interested purchaser should contact Debtor's counsel to request a copy of the Agreement.

deemed to be, a Qualified Bidder and a party in interest for all purposes, and does not need to take any further action to become a Qualified Bidder. If no other Qualified Bidders are identified, the LOI and Asset Purchase Agreement between the Debtor and Safety Vision, LLC shall be deemed the Highest and Best Bid (as defined below). No letter of intent or other written proposal submitted to the Debtor prior to the filing of this motion by any party other than Safety Vision, LLC shall constitute or be considered a Qualified Bid for purposes of these sale procedures. The Debtor shall be responsible for conducting the bid and sale process.

4. On or before 5:00 p.m. Central Standard Time on March 1, 2011, the Debtor shall file a notice with the Court identifying all Qualified Bidders and attaching copies of all bids that were timely received. All information received by the Debtor shall be shared with counsel for Safety Vision, LLC. The Debtor shall serve a copy of the notice and the corresponding bids on all Qualified Bidders by (a) facsimile or electronic mail or (b) overnight delivery.

5. If one or more timely Qualified Bids are received, an auction for the Purchased Assets will be conducted on **March 4, 2011, commencing at 10:00 a.m**. Central Standard Time at the U.S. Bankruptcy Court, United States Courthouse, Room 151, 500 State Avenue, Kansas City, Kansas, 66101. Only Qualified Bidders may participate in the auction. All Qualified Bidders, or their authorized representatives, must be physically present at the auction. At the commencement of the auction, the Debtor shall announce the bidding order, which shall be based on: (i) the amount of the Qualified Bidder's bid (from low to high); and (ii) if Qualified Bids are identical, the time the Qualified Bids were delivered to the Debtor (the first such received identical bid going first in the auction); *provided, however,* that Safety Vision, LLC shall bid last in any bidding round in which it participates. Minimum overbid increments at the auction shall be in the amount of not less than $100,000.00.

6. At the conclusion of the auction, the Debtor will announce the highest and best Qualified Bid ("**the Highest and Best Bid**") and the next highest and best Qualified Bid ("**the Back-Up Bid**"). The Debtor will seek approval of the Highest and Best Bid at the final sale hearing. If for any reason, the Qualified Bidder submitting the Highest and Best Bid fails to timely consummate the purchase of the Purchased Assets, the Debtor may seek to consummate a sale based on the Back-Up Bid without further approval by the Court. The Back-Up Bid and the obligation of the party submitting such bid to consummate the purchase of the Purchased Assets shall remain open and in full force until the close of a sale of the Purchased Assets to the party making the Highest and Best Bid or the party making the Back-Up Bid.

7. Within two business days after the conclusion of the auction described above, the Debtor shall return by check the full amount of the Deposit tendered by each Qualified Bidder whose bid was not selected as either the Highest and Best Bid or the Back-Up Bid (or Purchaser's Deposit, as defined in the LOI if Safety Vision is the holder of neither the Highest and Best Bid or the Back-Up Bid). If the sale of the Purchased Assets is consummated with the party submitting the Highest and Best Bid, the Deposit (or Purchaser's Deposit, if applicable) of

the party that is declared the Back-Up Bid shall be returned by check within two business days after the closing of the sale to the party submitting the Highest and Best Bid.

8. If (a) the Debtor enters into any agreements or arrangements in connection with any asset sale, stock sale, merger, debt for equity swap, joint venture, financing, reorganization, recapitalization or transfer (including the filing of a plan of reorganization with the Court) of any convertible debt, convertible equity or warrants the effect of which, individually or in the aggregate, is the direct or indirect transfer of a material portion of the Purchased Assets or the direct or indirect transfer of the ability to effectuate a change of control of the ownership of all or substantial portion of the Purchased Assets, or any similar transaction that does not involve, or delays or deters, a sale of the Purchased Assets to Safety Vision, LLC (each, "**an Alternative Transaction**"), (b) Safety Vision LLC is not otherwise in default or breach under the Letter of Intent (as defined in the Motion) or the Asset Purchase Agreement, and (c) either (i) Safety Vision LLC terminates the Asset Purchase Agreement pursuant to the APA thereof or (ii) the Debtor terminates the Asset Purchase Agreement pursuant to the APA thereof, then the Debtor shall pay to Safety Vision LLC the Break-Up Fee or Termination Fee, and the Reimbursable Expenses. The Break-Up Fee shall be payable solely from the proceeds of the Alternative Transaction.

9. The Debtor is authorized and directed to pay the Break-Up Fee or Termination Fee, and Reimbursable Expenses to Safety Vision LLC in accordance with the provisions of paragraph 8 of this Order and the provisions of the LOI, without further action or order of this Court.

10. This Order shall be effective and enforceable immediately upon entry.

IT IS SO ORDERED.

# # #

Submitted by:

Evans & Mullinix, P.A.

*<u>/s/ Joanne B. Stutz</u>*
Joanne B. Stutz, Ks #12365; Mo #30820
7225 Renner Road, Suite 200
Shawnee, KS 66217
(913) 962-8700; (913) 962-8701 (Fax)
jbs@evans-mullinix.com
*Attorneys For The Debtor*

Approved by:

Beirne Maynard & Parsons, LLP

*/s/ Trent L. Rosenthal*

Trent L. Rosenthal
Texas State Bar No. 17282300
1300 Post Oak Blvd., Suite 2500
Houston, TX 77056
(713) 623-0887; (713) 960-1527 (Fax)
trosenthal@pmpllp.com

and

Lewis, Rice & Fingersh, L.C.

*/s/ Scott A. Wissel*

Scott A. Wissel, KS #18589
1010 Walnut Street, Suite 500
Kansas City, MO 64106
(816) 421-2500; (816) 472-2500 (Fax)
sawissel@lrf-kc.com
*Attorneys for Safety Vision, LLC*

McAnany, Van Cleave & Phillips, P.A.

*/s/ George D. Halper*

George D. Halper, KS #14736
10 East Cambridge Circle Drive, Suite 300
P.P. Box 171300
Kansas City, SK 66117
(913) 371-3838; (913) 371-4722 (Fax)
ghalper@mvplaw.com
*Attorneys for Bank of Blue Valley*

January 17, 2011

**URGENT**

ICOP Digital, Inc.
c/o Mr. Thomas M. Mullinix
Evans & Mullinix, PA
7225 Renner Road
Shawnee, KS 66217

*Via Email*

Re: Purchase of ICOP Digital, Inc.'s Assets

Dear Sir:

The purpose of this letter agreement is to set forth the basic terms and conditions upon which NEWCO, a to-be formed Texas corporation, limited liability company and/or partnership owned in whole or in part by Safety Vision, L.L.C. and/or its assigns ("Purchaser" or "NEWCO"), is willing to purchase from ICOP Digital, Inc., a Colorado corporation ("Debtor," "ICOP" or "Seller"), and Seller is willing to sell to Purchaser, substantially all of the operating assets owned, leased or otherwise utilized by and in the Seller's business, including, without limitation, its distribution and sales business, including the related business operations (the "Transaction"). Such assets being more particularly described in paragraph 1. Except as set forth in paragraphs 6, 8, 11, 12, 13, 14, 15, 16, 17, 18, and 19, this letter agreement is not intended to be a binding offer or agreement, but, rather, an expression of the intent of Seller and Purchaser. With the exception of paragraphs 6, 8, 11, 12, 13, 14, 15, 16, 17, 18, and 19, any binding agreement between Seller and Purchaser will be reflected in the formal Asset Purchase Agreement described in paragraph 17.

We understand that the business of the Seller comprises (i) a distribution and sales business, and service business including ICOP products, and (ii) customers, intellectual property, patents and good will ("Customers") (collectively, the Seller's Business and the Customers shall be referred to as the "Business"). We further understand that Seller has or will file a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), and that the Transaction must be approved by the Bankruptcy Court.

1. <u>Assets</u>. Seller will sell to Purchaser and Purchaser will purchase from Seller all of the assets owned, leased or otherwise utilized by Seller in the Business (the "Assets"), including without limitation, the following:

(a) All of the fixed assets (including, if applicable, all trade fixtures, piping, equipment, vehicles (including, without limitation, the 4 cars, a Tahoe



Exhibit A

BS

SUV and one motorcycle used as demonstration vehicles), furniture, fixtures, supplies and materials) owned or otherwise utilized by Seller, including, but not limited to, those fixed assets, equipment and fixtures listed on Seller's financial statement dated December 31, 2010 attached hereto as **Attachment I**, including without limitation, the property on Schedule 1;

(b) All raw materials, inventory, work in process and inventories belonging to Seller, whether on hand or on order and whether located on Seller's Premises or otherwise, including without limitation, the inventories listed on **Attachment I** attached hereto but excluding any and all products for which payment is due and which have been ordered but not delivered or delivered but not yet paid for;

(c) All security deposits and all potential claims and/or reimbursement rights of Seller against others in connection with, or related to, Seller's Business;

(d) The Business;

(e) All customer lists of Seller, and all service agreements;

(f) To the extent transferable and, if transferable, transferable without cost, all rights possessed or utilized by Seller with respect to all computer hardware and computer software owned, leased, licensed or otherwise utilized by Seller. Any costs associated with the transfer of these items shall be borne by Purchaser and shall not be credited against the Purchase Price (as hereinafter defined);

(g) All rights possessed or utilized by Seller with respect to all existing or pending trade names, trade marks, service marks, copyrights, patents and other intellectual property and all marketing literature and other materials owned, licensed or otherwise utilized by Seller. Any costs associated with the transfer of these items shall be borne by Purchaser and shall not be credited against the Purchase Price (as hereinafter defined);

(h) All existing books and records of Seller through the Closing, including, without limitation, all of Seller's customer lists;

(i) All licensees, intellectual property, permits, franchise grants, easements, ordinances and certifications owned and/or held by Seller Any costs associated with the transfer of these items shall be borne by Purchaser and shall not be credited against the Purchase Price (as hereinafter defined)

BS

(j) All goodwill of Seller;

(k) Seller's name, "ICOP" and any derivative thereof, its logo, assumed name or names of Seller, along with any common law, state or federal trademark rights to said names(s), logos or marks, but excluding the NASDAQ trading symbol "ICOP";

(l) Seller's interest in any rental agreements or leases for equipment, if any, including any interest in the equipment covered thereunder, which may be assumed and assigned to Purchaser, in Purchaser's sole discretion, as listed on **Attachment II** attached hereto;

(m) Seller's computers, servers, laptop computers, tablets, ipods, cell phones, ipads, office equipment, computer programs, plans, drawings, budgets, software, etc., but subject to the Seller's right to use these items in order to facilitate an orderly wind-down of its business for a period not to exceed ninety (90) days;

(n) All web sites, URL's and domain names, including, without limitation, www.icop.com. Any costs associated with the transfer of these items shall be borne by Purchaser and shall not be credited against the Purchase Price (as hereinafter defined);

(o) All other property of Seller's Business, wherever located;

(p) All casualty and liability insurance policies, health, worker's compensation, casualty, and liability, if any and to the extent such policies are transferable. Any costs associated with the transfer of these items shall be borne by Purchaser and shall not be credited against the Purchase Price (as hereinafter defined);

(q) All pending contracts, if designated by Purchaser; and;

(r) All accounts and accounts receivable of Seller, which Seller has represented are approximately $442,426.64 in face amount (as of close of business January 12, 2010), together with any accounts generated through the Closing (collectively, the "Accounts")[1].

[1] The term "Accounts" specifically excludes any and all accounts generated after the Closing of the Transaction.



BS

**The Assets shall specifically not include (i) Cash or Deposits of Seller, (ii) the vehicle driven by Dave Owen; (iii) the unimproved real property owned by Seller; (iv) corporate servers and related computers and the items listed on Attachment III-Excluded Assets that contain information for SEC reporting and compliance; or (v) the ICOP publicly traded shell.**

2. **<u>Location of the Assets; Limitation on Representations and Warranties</u>.** Seller represents to Purchaser that all of the Assets are located at Seller's premises in Lenexa, Kansas, including, without limitation, the assets in the office and storage cave (collectively, the "Seller's Premises"). Except for a warranty of title to the Assets, Seller makes no representations or warranties, express or implied, regarding the condition of the Assets, and Purchaser agrees to accept the Assets in their AS IS, WHERE IS CONDITION, WITH ALL FAULTS.

3. **<u>Purchase Price; Payment; Purchaser Deposit; Possible DIP Facility; Adjustments to Purchase Price.</u>** The purchase price for the Assets (the "Purchase Price"), shall be the Purchaser's payment to Seller of Eight Hundred Thousand and No/100 Dollars ($800,000.00) CASH on the Closing Date, which shall be used as follows: (i) approximately $640,000 to be retained by Seller less the amount needed to pay-off the DIP Credit Facility provided by Seller, and (ii) approximately $160,000 to pay off the pre-petition factoring credit facility provided by First Growth, which facility may be assigned to Purchaser. Seller shall also retain the right to receive 50% of the actual net collection from the Accounts, which shall be promptly paid to Seller by Purchaser, when and if collected, which is estimated to be an additional consideration of approximately $220,000 but Purchaser makes no warranty or assurance regarding such amount. In the event that Purchaser desires to compromise an Account for less than 80% of the face amount due, Purchaser must first obtain from Seller approval of any such settlement. Purchaser shall also re-assign to Seller, at no cost to Seller, any and all Accounts that it deems uncollectible by the Purchaser on the date that is one (1) year after the Closing. Specifically, Purchaser may, in its discretion, purchase all rights and liens of First Growth under the factoring credit facility, and shall succeed to all rights and remedies of First Growth and/or Purchaser may provide a DIP Credit Facility, which shall be used to pay-off First Growth and for other agreed operating expenses. The indebtedness owing under the facility shall be paid in full at closing or sooner as required by the applicable documents (unless extended by Purchaser). Purchaser shall remit to Seller's counsel an earnest money deposit ("Purchaser's Deposit") in the amount of $10,000.00 within five (5) days after entry of the Interim Order (as hereinafter defined). Purchaser's Deposit shall be deposited into Seller's attorney's trust account and separately identified as a deposit in connection with this Agreement. In



BS

consideration of Seller agreeing to a deposit in the above-referenced amount and in the event that Purchaser is unable to complete this transaction through no fault of Seller (assuming Purchaser is the purchaser approved by the Court and subject to the conditions of closing set forth in Section 9, below), Seller's sole remedy shall be to retain Purchaser's Deposit a liquidated damages. Seller waives any and all legal and equitable remedies against Purchaser which might otherwise be available as a result of Purchaser's breach of this Agreement. Purchaser's Deposit shall be promptly returned in full without offset of reduction, if (i) Purchaser terminates the Transaction during the Inspection Period, (ii) Purchaser bid is not selected as the Highest and Best Bid or the Back-Up Bid, (iii) or if the Assets are sold to another party, or (iv) in the event that the Sale Order or Interim Order are not entered by the deadlines set forth below. Purchaser may, in its discretion, provide a DIP Financing Facility, on terms and conditions acceptable to Purchaser in its sole discretion, to be used to fund Seller's operation during the Seller's Chapter 11 case ("DIP Credit Facility"), which shall be secured by a first priority lien on all assets of Seller and shall be paid in full at Closing or when due under the facility. Furthermore, it is possible that the DIP Credit Facility will be a part of the existing factoring relationship with First Growth, which may be assigned to the Purchaser, or that proceeds of such DIP Credit Facility will be used to pay-off the factoring relationship. The Purchase Price shall be reduced and adjusted at Closing by an amount equal to (i) 25% of cost of the inventory sold from the inventory amount stated on the December 31, 2010 financial statement (i.e. 25% of every dollar of inventory sold from the inventory on hand on December 31, 2010 through the Closing shall be a direct credit/reduction to the Purchase Price), and (ii) 50% of any collections from the Accounts from the date of this letter through the Closing of the Transaction (e.g., if $1000 in accounts are collected after this letter is signed, the Purchase Price shall be reduced by $500).

4. **No Assumption of Liabilities.** Except as determined in writing by Purchaser in its sole discretion, no liabilities of Seller will be assumed. Purchaser is not assuming any liabilities or obligations under any pending contracts, current bonds, or to any customer or supplier of the Seller. After Closing, Seller shall cooperate with Purchaser in the following areas: Assist in the introduction of former employees of ICOP to Purchaser, as requested by Purchaser, with the possibility of becoming employees of Purchaser as may be requested by Purchaser.

5. **Assignment of Contracts**. On the Closing Date, Seller shall assign to Purchaser any executory lease agreements or un-expired leases designated by Purchaser in its discretion to be an assigned contract. Purchaser, at its sole cost and expense, shall cure all defaults, under any such assigned contract or lease.



BS

6. **Access for Inspections and Due Diligence**. Seller will, upon the execution of this letter agreement and continuing until the earlier of the Closing Date or the termination of this letter agreement and the Asset Purchase Agreement, provide Purchaser with access, during regular business hours and upon prior notice, to the Assets, Seller's Premises, and all information and documentation in Seller's possession related to the Assets reasonably requested by Purchaser or Purchaser's counsel for inspections and due diligence purposes. For purposes hereof, "Inspection Period" shall mean the period from the date hereof through and including the later of (i) the thirtieth (30th) day after execution of this letter by Seller, or (ii) twenty (20) days after entry of the Interim Order in the Bankruptcy Case (as those terms are hereinafter defined). Commencing with the execution of this letter, representatives of, and attorneys and auditors for, Purchaser shall conduct a due diligence review of the business activities of Seller, including all management matters, all financial, accounting and business records, all contracts and to other legal documents (the "Due Diligence Review"). Only if appropriate, all officers, directors, managers and employees of Seller shall cooperate fully in respect of the Due Diligence Review. Seller shall provide Purchaser with all financial and other information reasonably requested by it. Seller also authorizes Purchaser to contact Seller's employees about possible employment if the transaction is completed.

7. **No Material Adverse Change**. Between the date hereof and the Closing Date, there shall be no material adverse change in the condition (financial or otherwise), business project, properties, net worth or results or operations of Seller.

8. **Conduct of Business/Non-Compete from Seller's Officers.** From the date hereof until the Closing Date, the business of Seller shall be conducted as it is being conducted on the date hereof. Seller and/or its subsidiaries shall not make material commitments (over $5,000 per occurrence, or $10,000 in the aggregate). Additionally, as a condition to the Transaction and by their execution below, Laura Owen and David Owen shall execute and deliver a consulting agreement and non-compete agreement in favor of Purchaser in the form and substance satisfactory to Purchaser that (i) requires them to consult with the Purchaser for a period of ninety (90) days from the Closing, and (ii) prohibits them from competing in the United States with the Business for a period of no less than one (1) year from the Closing (the "Consulting Agreement"). Laura E. Owen and David C. Owen shall be paid jointly the sum of $20,000 per month for the period of three (3) month following the Closing subject to the terms of the Consulting Agreement (i.e. for 3 months at $20,000 per month jointly, for a total of $60,000, from the Closing). Purchaser shall have an option to extend on terms satisfactory to Purchaser at the same monthly rate and for a period acceptable to Purchaser.



BS

9. **<u>Conditions to Closing</u>**. The Closing of the purchase and sale of the Assets will be subject, among other things, to the following conditions:

(a) Seller will, at the Closing, have and convey to Purchaser by bill of sale with special warranty of title, good and marketable title to the Assets, free and clear of all liens, claims, interests and encumbrances;

(b) Seller and Purchaser will have entered into an Asset Purchase Agreement described in paragraph 17 on terms and conditions reasonably satisfactory to Seller and Purchaser;

(c) Purchaser will have completed to the satisfaction of Purchaser and its advisors a review of the Assets, Seller's operations, the financial statements of Seller and all contracts, leases and other agreements relating thereto, and the Inspection Period having expired, it being understood that Purchaser shall have the right to terminate the Transaction at any time during the Inspection Period for any reason or no reason;

(d) The parties shall have obtained all board and shareholder approvals, and such other consents and approvals of governmental authorities and other persons, as are necessary or desirable in connection with the consummation of the transaction made the subject of this letter agreement (the "Transaction");

(e) Seller shall have entered into a Non-Compete Agreement wherein Seller agrees not to compete with Purchaser in the United States,

(f) All consents to the assumption of the Assumed Leases, if any, that may be necessary have been obtained, and the insurance policies, if any and to the extent assignable, having been assigned to Purchaser;

(g) The Bankruptcy Court shall have approved the Transaction in accordance with the provisions of paragraph 13 hereof, and the Sale Order shall be enforceable and effective and not be subject to a stay;

(h) The DIP Credit Facility, if any, shall have been paid in full, whether at Clsoing or before;

(i) The pre-petition factoring arrangement with First Growth or its assignee shall be paid in full and all liens released, in accordance with paragraph 3, supra;



BS

If any of the conditions to the Closing provided for in this paragraph 9 are not satisfied by the Closing Date (hereinafter defined), either party will have the right and option to terminate the Asset Purchase Agreement by written notice to the other party if the failure of such condition was not within the control of the party seeking termination.

10. <u>**Closing**</u>. The closing of the purchase and sale of the Assets (the "Closing"), will take place on a date mutually acceptable to Seller and Purchaser but no later than fifteen (15) days after the later of (i) expiration of the Inspection Period or (ii) entry of the Sale Order (as hereinafter defined) (the "Closing Date"), at the offices of the law firm of Evans & Mullinix, P.A., 7225 Remer Road, Suite 200, Shawnee, KS 66217. The Seller and Purchaser may agree to extend the date for Closing. At the Closing, the following will occur:

(a) Seller will convey and deliver to Purchaser good and marketable title to the Assets, free and clear of any liens, claims and encumbrances, pursuant to the Sale Order; and

(b) Purchaser will deliver to Seller the Purchase Price (i.e. Cash).

(c) **Post Closing Use and Access to Premises.** Purchaser shall have post closing access to the Seller's Premises to remove the Assets for a reasonable period of time after the Closing, not less than twenty (20) days after Closing. If, and only if, the premises are retained/leased by Purchaser on an interim/short term basis, Sellers shall have limited access post-Closing on a month-to-month basis to Seller's corporate headquarters located in Lenexa, Kansas for up to four (4) months after the Filing Date to review and copy Sellers' books and records sold hereunder for use in connection with Seller's Chapter 11 case, and, in all cases, Purchaser shall have full access to the books and records necessary for the Purchaser's operation of the Business, and said books and records shall be made available to Purchaser at the Seller's current premises or at a location agreed to by and between Seller and Purchaser. Provided, however, the books and records need to be available to ICOP in the Kansas city area until two (2) year from Closing.

11. <u>**Public Announcements**</u>. Any public announcements or statements concerning the Transaction contemplated herein must be jointly approved by Purchaser and Seller. However, in the event the parties are unable to agree on a public statement or announcement following the execution of this letter agreement, and Seller or Purchaser determines, after consultation with counsel, that such statement or announcement is required by law in connection with Seller's Chapter 11 reorganization or SEC reporting requirements, then Seller or Purchaser, as the

BS

case may be, may issue such statement or announcement. For avoidance of any doubt, the reference to and inclusion of this letter and terms of this Transaction in connection with a Form 8K shall not constitute a prohibited public announcement or press release.

12. <u>**Purchaser Protection Provisions.**</u> As a condition to Purchaser's participation in the Transaction, Seller shall provide Purchaser, subject to Bankruptcy Court approval, the following Purchaser Protection (collectively, the "Purchaser Protection Provisions"):

(a) <u>Interim Order Approving Purchaser Protection Provisions and Letter Agreement</u>. Promptly after execution of this letter agreement by Seller and Purchaser, but in all cases within three (3) business days after execution of this letter agreement by Seller, Seller shall file an expedited motion with the Bankruptcy Court under Rule 9013 of the Federal Rules of Bankruptcy Procedure and Section 363 of the Bankruptcy Code, seeking approval of (i) the Purchaser Protection Provisions, and (ii) this letter agreement, and shall use its best efforts to obtain as soon as reasonably practicable an Interim Order Approving Purchaser Protection Provisions, Letter Agreement in form and substance satisfactory to Purchaser. If the Interim Order is not obtained by January 25, 2011, Purchaser may terminate the Transaction.

(b) <u>Reimbursement of Purchaser's Expenses</u>. Seller hereby acknowledges and agrees that Purchaser has incurred and will continue to incur substantial expenses, including the fees and expenses of legal counsel and financial advisors in connection with investigating the business and operation of Seller, and negotiating and preparing various documentation, including, without limitation, this letter agreement, the Interim Agreement, the Asset Purchase Agreement, the pleadings seeking Court approval of the sale and the closing documents (the "Reimbursable Expenses"). Purchaser shall provide a detail of the Reimburseable Expenses sought. In recognition of such expenditures and to induce Purchaser to continue to incur such expenses, Seller shall pay Purchaser up to $50,000 in Reimbursable Expenses in the event (i) the Transaction is not consummated for any reason other than a material default by Purchaser of its obligations under the Asset Purchase Agreement, or (ii) if Purchaser determines not to consummate the Transaction because of the failure of a condition precedent in the Asset Purchase Agreement.

(c) <u>Termination Fee</u>. Seller agrees that, in the event of a termination of the Transaction as a result of a default by Seller, Sellers shall, upon demand,



BS

pay to Purchaser a termination fee in the amount of $80,000 (the "Termination Fee") in addition to payment to Purchaser of the Reimbursable Expenses.

(d) Break-Up Fee. In addition to payment of the Reimbursable Expenses or Termination Fee (if due), Seller shall pay Purchaser, if Purchaser is prepared to consummate the Transaction outlined herein, $80,000 (the "Break-Up Fee") in cash as compensation for the time incurred and value to Seller in the event the Assets are sold to any other entity under § 363 of the Bankruptcy Code or any plan is confirmed in the Bankruptcy Case (as hereinafter defined) which does not involve Purchaser or does not provide for Purchaser to be the acquiring entity for the Assets or the Seller's business.

(e) Only Single Fee Recovery; Reservation of Equitable Rights and Remedies. In no event shall Seller be liable for both the Break-Up Fee and Termination Fee. The payment of the Reimbursable Expenses, Termination Fee, and the Break-Up Fee shall not in any way limit any of Purchaser's equitable rights or remedies against Seller, and Purchaser reserves such rights and the right to pursue its remedies in equity against Seller or any other third party.

(f) Overbid.. The Bankruptcy Court shall not approve, and Seller shall not support, any transfer of the Assets, so long as Purchaser is prepared to consummate the Transaction, unless such other transaction provides a Purchase Price of at least $200,000 above the cash Purchase Price set forth herein, and includes the retention of the 50% of the accounts by Seller, and provides for payment to Purchaser of the amounts described in (b-e) above. Accordingly, the initial overbid amount shall be $1,000,000.00 plus 50% of the Accounts. Such payment owing to Purchaser described herein shall be granted administrative expense priority in Seller's estate.

(g) Administrative Expense Status. The Reimbursable Expenses and Termination Fee or Break-Up Fee (as applicable) shall constitute first priority administrative expenses of Seller pursuant to § 503 of the Bankruptcy Code, shall be secured by a valid and enforceable senior lien on all of Sellers' assets, and shall be paid by Seller at the closing of the sale of the Assets, or upon entry of further order of the Bankruptcy Court directing payment of same in the event a sale is not concluded..

(h) Purchaser shall have the right to approve any auction procedures proposed by Seller, including the time and date of any auction, the required



BS

qualifications of any bidders, and the bidding increment. For purposes of any auction, Purchaser shall automatically be deemed a qualified bidder.

13. Bankruptcy Court Approval. Purchaser and Seller hereby acknowledge that Seller is or will be a debtor in a case under the Bankruptcy Code pending in the United States Bankruptcy Court for the District of Kansas (the "Bankruptcy Court"), Case No. **(to be provided)** (Chapter 11) (the "Bankruptcy Case"). Seller shall, within five (5) days after entry of the Interim Order or such later date as may be agreed by Purchaser in its sole discretion, file a motion with the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 9013 and Sections 363 and 365 of the Bankruptcy Code (the "Sale Motion") seeking (i) final approval of this Letter Agreement and approval of the Asset Purchase Agreement and entry of an Order approving the sale of the Assets to Purchaser, free and clear of all liens, claims, security interests, interests, and encumbrances pursuant to Section 363 of the Bankruptcy Court (except for the Assumed Liens), and (ii) assumption and assignment of the executory contracts and unexpired leases that will be designated by Purchaser. Seller shall use its best efforts to obtain Bankruptcy Court approval of the Sale Motion as soon as practicable; provided, however, if a Final Order (as hereinafter defined) of the Bankruptcy Court is not obtained on or before March 15, 2011, Purchaser may terminate the Transaction. The Asset Purchase Agreement shall be subject to entry of a Final Order of the Bankruptcy Court ("Final Order" or "Sale Order") approving the (i) Sale Motion, (ii) the Asset Purchase Agreement, (iii) the sale of the Assets to Purchaser free and clear of all liens, claims, interests, and encumbrances, in the form and substance approved by Purchaser, and (iv) the assumption and assignment of the executory contracts and unexpired leases that may be designated by Purchaser; and (v) waiving the fourteen (14) day stay under Rule 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure and making such sale order effective and enforceable immediately. As a condition to Purchaser's obligations hereunder, the Bankruptcy Court shall have entered a Final Order approving the sale in a form and substance acceptable to Purchaser, as to which no appeals or motions for rehearing are pending and as to which no stay is issued and the time for filing same has expired; provided, however, if an appeal or motion for rehearing is pending, Purchaser may waive the requirement for a Final Order and close the Transaction provided there is no stay of the effects of such Final Order. For purposes hereof, the Motion seeking entry of the Interim Order may also be the same motion as the Sale Motion, and the Interim Order an the Final Order may be contained in the same order of the Court, however, the Interim Order must be timely entered by the deadline set in Paragraph 12(a) above. The terms and provisions of any Plan in the Seller's case, if filed before a sale to Purchaser is final, are subject to the approval of the Purchaser and must incorporate the terms and provisions in this letter and in the Asset Purchase

BS

Agreement. Entry of the Sale Order is a condition precedent to closing of the Transaction.

14. **Confidentiality.** All information furnished to Purchaser in connection with the Due Diligence Review that is identified in writing by Seller as being confidential shall be held by Purchaser as proprietary information of Seller (the "Proprietary Information"). The Proprietary Information shall not include, however, information that has been disclosed to the public by Seller or that is currently known to Purchaser. Any Proprietary Information that is subsequently disclosed to the public by Seller shall lose its character as proprietary information at the time of disclosure. Purchaser and Seller shall, and shall cause each of their respective directors, officers, partners, employees, representatives and agents, to hold in strictest confidence and not use in any manner whatsoever, other than as contemplated by this letter agreement, (a) any confidential information of the other party, including any trade secrets or other information not generally available to the public, and (b) the terms and provisions of this letter agreement to any third parties, except to the Bankruptcy Court and creditors in the Bankruptcy Case, and their professionals and advisors, and any party interested in making a competing bid for the Assets, and their professionals and advisors.

15. **Professional Fees.** Except as provided in paragraph 12 hereof, each of Seller and Purchaser will pay for the costs of their own professional advisors, including attorneys, accountants, and financial advisors associated with this Transaction; provided, however, the DIP Credit Facility may include a provision to loan the Seller monies for the purposes of payment of professional fees in accordance with and subject to the terms and limitations of the DIP Credit Facility Agreement.

16. **Assignability.** This letter agreement shall not be assignable by either Seller or Purchaser, except with the prior written consent of the other party; provided, however, Purchaser may assign its rights to an affiliate or any entity owned in whole or in part by Purchaser and/or his affiliates. Any permitted assignment shall not release the assigning party of any of its obligations under this letter agreement.

17. **Formal Asset Purchase Agreement.** Seller and Purchaser will enter into a formal Asset Purchase Agreement (the "Asset Purchase Agreement") incorporating the terms and conditions contained in this letter agreement. The formal Asset Purchase Agreement will contain such additional terms and conditions, including without limitation, representations, warranties, covenants, indemnifications, conditions to closing and other provisions consistent with the terms of this letter agreement as are typically included in an asset purchase agreement and earnest money contract for a transaction of the type, size and



BS

nature described in this letter agreement. Seller and Purchaser agree to negotiate in good faith to complete the Asset Purchase Agreement on or before the expiration of the Inspection Period. If the Asset Purchase Agreement has not been executed by the expiration of such Inspection Period, the understandings set forth in this letter agreement shall expire and the parties shall have no further obligations to each other, except as provided in paragraphs 6, 8, 11, 12, 13, 14, 15, 16, 17, 18, and 19. Provided, however, if Purchaser is not prepared to enter into an Asset Purchaser Agreement on the terms and condition of this letter agreement, it is not entitled to a Break-Up Fee.

18. **Regulatory Approvals**. The closing of the Transactions shall be conditioned upon, among other things, the receipt of all requisite regulatory approvals, including those under federal and state communication and antitrust laws, if applicable, and Seller and their officers and directors shall cooperate in obtaining such approval.

19. **Interim Exclusive Distribution Agreement.** Seller and Purchaser may, in Purchaser's sole and absolute discretion, enter into an interim exclusive distributorship agreement in a form mutually acceptable to Seller and Purchaser pending Closing of the Transaction providing Purchaser as the sole distributor of Seller's products. Seller shall seek Bankruptcy Court approval of such agreement as part of the Interim Order.

Except as set forth above in the paragraphs 6, 8, 11, 12, 13, 14, 15, 16, 17, 18, and 19, which paragraphs shall be legally binding and enforceable upon the execution and delivery of this letter agreement by Seller and Purchaser, Purchaser and Seller agrees that no definitive agreement or meeting of the minds regarding the Transaction contemplated in this letter agreement has been reached, and that this letter agreement is a statement of intention only and is not to be interpreted as a commitment by either Sellers or Purchaser, provided, however, with respect to pargraphs 6, 8, 16, 17 and 18, these paragraphs shall be not binding if the Transaction is terminated prior to entry of the Interim Order. Neither Seller nor Purchaser shall be obligated to proceed with the Transaction contemplated by this letter agreement until the definitive Asset Purchase Agreement has been fully executed and delivered.

The agreements contained herein supersede all prior agreements relating to the subject matter hereof. The parties to this letter agreement agree that this letter agreement may be executed in multiple originals, each of which will be considered an original for all purposes. The parties to this letter agreement further agree that facsimile signatures may be considered an original for all purposes, including, but not limited to, execution of this letter agreement and enforcement of this letter agreement.



BS

If the foregoing terms and conditions are acceptable to you as the basis upon which Purchaser will purchase and Seller will sell the Assets, please so indicate by signing a copy of this letter agreement in the space provided for your signature, and returning a fully executed copy to the undersigned. Upon receipt of a fully executed copy of this letter agreement, we will instruct our counsel to proceed with the preparation of the initial draft of the Asset Purchase Agreement.

This letter will expire and become invalid unless executed by Seller prior to 4:30 p.m., Houston, Texas time on January 17, 2011.

We look forward to hearing from you and working toward a successful conclusion of this Transaction.

Sincerely yours,

NEWCO

By: [signature]
Name: Bruce Smith
Title: CEO

cc: Mr. Trent Rosenthal *(via email)*

---

**ACCEPTED AND AGREED** to

this 18th day of January, 2011

**ICOP DIGITAL, INC.**

By: ______________________
David C. Owen, CEO

**JOINDER**

The Undersigned join herein for the sole purpose of agreeing to the terms and provisions of paragraph 8 hereof:

AGREED, ACKNOWLEDGED, JOINED AND ACCEPTED BY:

______________________
LAURA E. OWEN

______________________
DAVID C. OWEN



BS

**ATTACHMENT I**
**FINANCIAL STATEMENT OF SELLER**

BS

2:20 PM
12/31/10
Accrual Basis

# ICOP DIGITAL, INC.
## Balance Sheet
### As of December 31, 2010

| | Dec 31, 10 |
|---|---|
| **ASSETS** | |
| Current Assets | |
| Checking/Savings | |
| Cash Accounts | |
| 0-10000 · Bank of Blue Valley (7680) | 12,410.34 |
| 0-10010 · Community America - Savings | 11.00 |
| 0-10020 · Community America - Checking | 89.00 |
| 0-10030 · FNB FLEX ACCT. 017-823-3 | 1,648.76 |
| 0-10060 · Bank of America Checking (4823) | 1,128.77 |
| 0-10070 · FNB Olathe Checking 013-960-2 | 3,186.43 |
| 0-10080 · FNB Payroll Acct. 014-952-7 | 3,627.98 |
| 0-10085 · FNB - ESPP 020-072-7 | 2,211.58 |
| Total Cash Accounts | 24,213.86 |
| Foreign Cash Accounts | |
| 0-10200 · YEN Bank of America 11407006 | -3,465.15 |
| 0-10210 · Yen Currency Fluctuation | 3,465.15 |
| Total Foreign Cash Accounts | 0.00 |
| Total Checking/Savings | 24,213.86 |
| Accounts Receivable | |
| Accounts Receivable | |
| 0-11000 · Accounts Receivable - Trade | 660,171.23 |
| 0-11010 · Accounts Receivable - Dealers | 23,719.75 |
| 0-11100 · Allowance for Doubtful Accounts | -100,456.68 |
| Total Accounts Receivable | 583,434.30 |
| Total Accounts Receivable | 583,434.30 |
| Other Current Assets | |
| Inventory | |
| 0-12000 · Inventory | 2,199,083.28 |
| 0-12200 · WIP WC-2000 | 254.66 |
| Total Inventory | 2,199,337.94 |
| Prepaid Expenses | |
| 0-13000 · Prepaid Expenses | 41,267.42 |
| 0-13010 · Prepaid Insurance | 36,863.97 |
| Total Prepaid Expenses | 78,131.39 |
| Other Current Assets | |
| 0-14000 · Deposits | 132,865.84 |
| 0-14110 · Employee Benefits - FLEX WH | -2,385.61 |
| 0-14120 · Employee Benefits - Guardian | 62.38 |
| 0-14130 · Employee Benefits - UHC | 107.74 |
| 0-14140 · Employee Benefits - Aflac | 90.16 |
| 0-14200 · Other Assets-Inventory for Part | 162,282.39 |
| Total Other Current Assets | 293,022.88 |
| Total Other Current Assets | 2,570,492.21 |
| Total Current Assets | 3,178,140.37 |
| Fixed Assets | |
| Property Plant & Equipment, Net | |
| Property Plant and Equipment | |
| 0-15200 · Equipment | 966,464.70 |
| 0-15300 · Vehicles | 214,341.43 |
| 0-15400 · Furniture & Fixtures | 284,661.90 |
| 0-15500 · Land | 1,000,259.41 |
| 0-15600 · Leasehold Improvements | 207,659.51 |



BS

# ICOP DIGITAL, INC.
## Balance Sheet
### As of December 31, 2010

| | Dec 31, 10 |
|---|---|
| 0-15700 · Other | 199,566.25 |
| Total Property Plant and Equipment | 2,872,973.20 |
| Accumulated Depreciation | |
| 0-16000 · Accum Depreciation | -1,653,731.25 |
| Total Accumulated Depreciation | -1,653,731.25 |
| Total Property Plant & Equipment, Net | 1,219,241.95 |
| Total Fixed Assets | 1,219,241.95 |
| Other Assets | |
| Long Term Assets | |
| 0-18000 · Deferred patent costs | 102,275.37 |
| 0-18010 · RVFD Fire Education,LLC | 25,000.00 |
| 0-18100 · Security Deposit on Lease | 17,500.00 |
| Total Long Term Assets | 144,775.37 |
| Total Other Assets | 144,775.37 |
| TOTAL ASSETS | 4,542,157.69 |
| LIABILITIES & EQUITY | |
| Liabilities | |
| Current Liabilities | |
| Accounts Payable | |
| Accounts Payable | |
| 0-20000 · Accounts Payable | 630,701.71 |
| Total Accounts Payable | 630,701.71 |
| Total Accounts Payable | 630,701.71 |
| Other Current Liabilities | |
| Accrued Liabilities | |
| Accrued Expenses | |
| 0-21000 · Accrued Expenses - Other | 72,455.40 |
| 0-21010 · Accrued Property Taxes | 26,686.29 |
| 0-21020 · Accrued Sales Tax | 3,330.11 |
| Total Accrued Expenses | 102,471.80 |
| Accrued Payroll | |
| 0-21100 · Accrued Vacation pay | 213,262.78 |
| 0-21120 · Accrued Commissions | 20,002.00 |
| 0-21130 · Accrued Payroll | 22,806.66 |
| Total Accrued Payroll | 256,071.44 |
| Accrued Benefits | |
| 0-21400 · 401k Withheld | 43.82 |
| 0-21410 · ESPP Withheld | 2,207.34 |
| Total Accrued Benefits | 2,251.16 |
| Total Accrued Liabilities | 360,794.40 |
| Notes Payable | |
| 0-22000 · N/P - Bank of Blue Valley | 479,984.97 |
| Total Notes Payable | 479,984.97 |
| Due to Factor | |
| 0-22100 · FGC Purchasing Agreement | 142,246.33 |
| Total Due to Factor | 142,246.33 |
| Unearned Revenue | |



BS

2:20 PM
12/31/10
Accrual Basis

# ICOP DIGITAL, INC.
## Balance Sheet
### As of December 31, 2010

| | Dec 31, 10 |
|---|---|
| 0-23500 · Deferred Warranty Revenue - Mod | 586,349.23 |
| Total Unearned Revenue | 586,349.23 |
| Total Other Current Liabilities | 1,569,374.93 |
| Total Current Liabilities | 2,200,076.64 |
| Total Liabilities | 2,200,076.64 |
| Equity | |
| Shareholders' Equity - CS | |
| 0-30000 · Bridge Warrant 2005 Proceeds | 164,991.75 |
| 0-30010 · Stock Option Proceeds | 52,650.00 |
| 0-30020 · Public Warrant Proceeds | 769,171.09 |
| 0-30040 · Common Stock | 36,343,227.14 |
| 0-30050 · Common Stock Restricted | 1,660,000.00 |
| 0-30060 · Options Outstanding | 2,076,270.47 |
| 0-30065 · Warrants | 88,660.94 |
| 0-30070 · Offering Costs | -2,250,025.22 |
| Total Shareholders' Equity - CS | 38,804,946.17 |
| Other Comprehensive Income | |
| 0-31000 · Deferred currency exchange | 3,465.15 |
| Total Other Comprehensive Income | 3,465.15 |
| 0-32000 · Retained Deficit | -30,554,685.72 |
| Net Income | -5,911,644.55 |
| Total Equity | 2,342,081.05 |
| TOTAL LIABILITIES & EQUITY | 4,542,157.69 |



BS

**SCHEDULE 1**
**EQUIPMENT TO BE PURCHASED FREE AND CLEAR OF ALL LIENS**



BS

**SCHEDULE 1**
**EQUIPMENT TO BE PURCHASED FREE AND CLEAR OF ALL LIENS**

**All equipment located at ICOP Digital, Inc, 16801 W. 116th Street, Lenexa, Ks 66219 and in the Meritex Cave warehouse located at 17501 W. 98th Street, #38-38, Lenexa, Ks 66219.**



BS

**ATTACHMENT II**
**RENTED EQUIPMENT**

**NONE**



BS

## ATTACHMENT III - EXCLUDED ASSETS





BS

# ICOP EXCLUDED EQUIPMENT

ICOP DC1 SERVER AND ICOP AS1 SERVER CONTAINING ALL ICOP DATA
ALL SOFTWARE AND HARDWARE NECESSARY TO ACCOMMODATE SERVERS
QUICKBOOKS AND FISHBOWL SOFTWARE

WORK STATION & ATTACHMENTS IN HUMAN RESOURCES OFFICE
5 FILE CABINETS

HUMAN RESOURCES COMPUTER & PRINTER
TWO WORK STATIONS & ATTACHMENTS IN ACCOUNTING OFFICES
8 FILE CABINETS
2 COMPUTERS AND PRINTERS
DP-8035 PRINTER
MICKIE'S COMPUTER
MICKIE'S BOOKCASE

DAVE'S COMPUTER CELL PHONE
LAURA'S COMPUTER & CELL PHONE

ALL THE INFORMATION EXPORTED FROM ICOPS ACCOUNTING (QUICKBOOKS) AND CRM (FISHBOWL) PACKAGES, IN ADDITION TO PROPOSALS THAT MAY HAVE BEEN CREATED IN EXCEL OR WORD, ARE NOT EXCLUDED ASSETS AND ARE BEING SOLD TO PURCHASER AND SHALL BE DELIVERED TO PURCHASER AT CLOSING (OR ACCESS GIVEN TO PURCHASER AT ALL TIMES).



BS